1

2

3

4

5

6

7

**FILED**

JAN - 9 2002

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

8              UNITED STATES DISTRICT COURT

9              EASTERN DISTRICT OF CALIFORNIA

10                    ----oo0oo----

11  ESTATE OF SOLOMON ELI TORRES,
    et al.,
12                                  NO. CIV. S-98-2211 WBS/GGH
             Plaintiffs,
13
        v.                          MEMORANDUM AND ORDER
14
                                    RE: Eddie Myers, David
15                                  Tristan, and Steve Cambra;
                                    Motion for Summary Judgment
16  CAL A. TERHUNE, et al.,

17           Defendants.
                          ----oo0oo----
18

19          Plaintiffs Estate of Solomon Torres, et al. sue

20  defendants Cal Terhune et al. for various federal constitutional

21  and state law claims.  Defendants Eddie Myers, David Tristan, and

22  Steve Cambra, former officials for the California Department of

23  Corrections ("CDC"), move for summary judgment pursuant to

24  Federal Rule of Civil Procedure 56.

25  I.  Factual and Procedural Background

26          Plaintiffs allege that defendant prison officials shot

27  and killed Solomon Eli Torres aka David Solomon Torres

28  ("Torres"), an inmate at California's High Desert State Prison

1

S43

1   ("HDSP"), during a prison-yard altercation between inmates
2   belonging to the "Southern Hispanics" and "Others" factions on
3   February 4, 1998.  Plaintiffs allege that the altercation among
4   the "Southern Hispanics" and "Others" in February 1998 was in
5   retaliation for a prior incident in November 1997 in which two
6   inmates from "Southern Hispanics" stabbed two inmates from
7   "Others."[1]  (Pls.' Opp'n at 7).  As a result of the November 1997
8   incident, the two groups were placed on "lockdown" status, which
9   limited their access to various prison programs and activities.
10  Torres was included among the "Southern Hispanics" who were
11  placed on lockdown.  Members of the "Others" group were released
12  from lockdown in December and January 1997, and the Southern
13  Hispanics group remained on lockdown until they were released on
14  February 4, 1998, the date of the fatal shooting incident.

15          Plaintiffs contend that Torres was on the ground,
16  receiving severe blows from another inmate, when he was shot.
17  (Pls.' Opp'n at 12).  Defendants argue that Torres was kicking
18  another inmate in the head at the time of the shooting.  (Defs.'
19  Mot. at 4).

20          Plaintiffs argue that the policies and practices
21  related to the use of lethal force at HDSP in 1998 were
22  unconstitutional.  (Am. Compl. ¶ 64).  They further allege that
23  defendants failed to properly train and supervise correctional

24

25          [1]   A HDSP memorandum summarizing events leading up to the
26  February 4, 1998 incident suggests that the November 1997
    incident involved four "Southern Hispanics" inmates and five
27  "Others" inmates.  The November 1997 incident apparently occurred
    in retaliation for an incident in August 1996, in which two
28  inmates from the "Others" group assaulted a "Southern Hispanics"
    inmate. (Pls.' Opp'n Ex. 5)

1 │ officers in the use of lethal force against inmates.   (Am. Compl.
2 │ ¶ 69).

3 │       Plaintiffs contend that prior to the February 1998
4 │ altercation, defendants adopted an "integrated yard policy,"
5 │ under which inmates of various ethnic and factional affiliations
6 │ were sent into the yard.   (Am. Compl. ¶ 95).   According to
7 │ plaintiffs, this environment was promoted despite prison
8 │ officials' knowledge of intercultural hostilities between inmates
9 │ and the likelihood of violent altercations when members of these
10 │ groups were released to the yard at the same time.

11 │       Plaintiffs further allege that the Shooting Review
12 │ Board ("SRB"), which was convened after the incident to
13 │ investigate whether the shooting was in compliance with CDC
14 │ policy, ignored significant testimony and evidence in preparing
15 │ its report.   (Pls.' Opp'n at 14).   They contend that the
16 │ Executive Use of Force Committee, which reviewed the SRB report,
17 │ accepted inaccurate explanations from the SRB about
18 │ inconsistencies in evidence, without further investigation.
19 │ (Id.).

20 │       At the time of the incident that gave rise to this
21 │ litigation, Myers was retired from the CDC, Tristan was the
22 │ Director of Institutions, and Cambra was the Chief Deputy
23 │ Director of Operations.   (Defs.' Mot. at 1, 5).   Defendants now
24 │ move for summary judgment on various grounds including qualified
25 │ immunity.

26 │ II.   Discussion

27 │       The court must grant summary judgment to a moving party
28 │ "if the pleadings, depositions, answers to interrogatories, and

3

admissions on file, together with the affidavits, if any, show
that there is no genuine issue as to any material fact and that
the moving party is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(c).  The party adverse to a motion for summary
judgment may not simply deny generally the pleadings of the
movant; the adverse party must designate "specific facts showing
that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e);
Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  Simply put, "a
summary judgment motion cannot be defeated by relying solely on
conclusory allegations unsupported by factual data."  Taylor v.
List, 880 F.2d 1040, 1045 (9th Cir. 1989).  The non-moving party
must show more than a mere "metaphysical doubt" as to the
material facts.  Matsushita Elec. Indus. Co. v. Zenith Radio, 475
U.S. 574, 587 (1986).

   A.  Qualified Immunity

        A public official is entitled to qualified immunity if
the law governing the official's conduct was not clearly
established, or if under clearly established law he could have
reasonably believed that his conduct was lawful.  Jeffers v.
Gomez, 267 F.3d 895, 910 (9th Cir. 2001).  The defendant bears
the burden of establishing qualified immunity.  Crawford-El v.
Britton, 523 U.S. 574, 586-87 (1998).

        The United States Supreme Court recently articulated
the following test for determining qualified immunity.  As a
threshold question, the court must ask: "Taken in the light most
favorable to the party asserting the injury, do the facts alleged
show the [official's] conduct violated a constitutional right?"
Saucier v. Katz, 121 S.Ct. 2151, 2156 (2001).  If the answer is

1 affirmative in that "a violation could be made out on a favorable
2 view of the parties' submissions, the next, sequential step is to
3 ask whether the right was clearly established." Id. at 2156.
4 The Court emphasized that the "relevant, dispositive inquiry in
5 determining whether a right is clearly established is whether it
6 would be clear to a reasonable [official] that his conduct was
7 unlawful in the situation he confronted." Id. If the answer is
8 negative, the official is entitled to qualified immunity.

9         The Supreme Court has repeatedly "stressed the
10 importance of resolving immunity questions at the earliest
11 possible stage in litigation." Hunter v. Bryant, 502 U.S. 224,
12 227 (1991), cited in Saucier, 121 S.Ct. at 2156. Where a
13 defendant seeks qualified immunity, "a ruling on that issue
14 should be made early in the proceedings so that the costs and
15 expenses of trial are avoided where the defense is dispositive."
16 Id. at 2156-57.

17         B.  Supervisory Liability

18         A supervisory official is not liable for the actions of
19 subordinates on a respondeat superior theory under 42 U.S.C. §
20 1983. Jeffers, 267 F.3d at 915 (citing Hansen v. Black, 885 F.2d
21 642, 645-46 (9th Cir. 1989)). "A supervisor may be liable under
22 § 1983 only if there exists either (1) his or her personal
23 involvement in the constitutional deprivation, or (2) a
24 sufficient causal connection between the supervisor's wrongful
25 conduct and the constitutional violation." Id. (internal
26 quotations omitted). A causal connection is "an affirmative
27 link" between a constitutional deprivation and "the adoption of
28 any plan or policy by [a supervisor,] express or otherwise

5

1  showing [his or her] authorization or approval of such

2  misconduct." Rizzo v. Goode, 423 U.S. 362, 371 (1976).  The

3  inquiry into causation "must be individualized" and focused on

4  the duties and responsibilities of the individual defendant whose

5  acts or omissions are alleged to have caused a violation.  Leer

6  v. Murphy, 844 F.2d 628, 633 (9th Cir. 1988).

7         Myers, Tristan or Cambra were not at HDSP on February

8  4, 1998 and did not directly participate in the release of

9  inmates, the response to the altercation, or the rendition of

10  medical aid.  (Defs.' Stmt. of Undisputed Mat. Facts, hereinafter

11  "Defs.' SUF" at 1, 17, 24).  Therefore, plaintiffs' claims

12  against these defendants can only be examined in the context of

13  their policy-level activities.[2]  Jeffers, 267 F.3d at 916.

14      C.  Eighth Amendment Claims under Section 1983

15          1.  Use of Force Policy

16              Plaintiffs allege that defendants adopted and

17

18        [2]   The following was the chain of command in effect at CDC
   in February 1998:  Cal Terhune was the Director of the CDC.
19  Beneath the Director was the Office of the Chief Deputy Director,
   and Cambra was the Chief Deputy Director of Operations.  Beneath
20  the Chief Deputy Directors were various Deputy Directors.
   Tristan was the Deputy Director of the Institutions Division.
21  Below Tristan were three Regional Administrators, one each for
   the north, central and south regions.  The wardens of the various
22  institutions reported to the Regional Administrators.  Custodial
   issues flowed from the warden, to the Regional Administrator, to
23  the Deputy Director of Institutions (Tristan), to the Chief
   Deputy Director of Operations (Cambra) and eventually to the
24  Director.  Issues related to medical services flowed from the
   Health Care Manager to the Regional Administrator for Health Care
25  Services, to the Deputy Director of Health Care Services
   Division, to the Chief Deputy Director of Operations (Cambra) and
26  eventually to the Director.  The personnel who oversaw training
   included the Chief of Training Division, the Chief Deputy of
27  Administrative Services, and the Director.  Myers was employed as
   a Chief Deputy Director from 1995 to 1997 and was retired in
28  February 1998.  (Defs.' Mot. at 5; Myers Decl. at 1-2).

implemented policies regarding the use of lethal force against inmates which led to the shooting death of Torres, in violation of his Eighth and Fourteenth Amendment rights.   Defendants are entitled to qualified immunity for claims arising out of their policy decisions unless the policy is "so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation." _Jeffers_, 267 F.3d at 914 (citing _Redman v. County of San Diego_, 942 F.2d 1435, 1446 (9th Cir. 1991)) (internal quotations omitted).

The use of force policy in effect at the time of the incident provided that:

> firearms shall only be used when reasonably necessary to prevent or stop escapes, the taking of hostages, or other circumstances which present an immediate danger of escape, loss of life, great bodily injury, or damage to a substantial amount of valuable property.

(Defs.' Mot., Ex. A).   The policy further provided that firearms "shall be used only as a last resort after other reasonable and available resources have been considered and exhausted or are determined to be clearly inappropriate in view of the immediate need to use armed force." (_Id._).   The policy stated that when necessary to aim and fire at a person, "the shot should, whenever possible, be aimed to disable and stop rather than to kill." (_Id._).   Finally, the policy provided that firearms were not to be used to stop "fist fights" between inmates when there is no danger of death or great bodily harm.   (_Id._)

The use of force policy was not promulgated by a single person, but rather was the result of a "quasi-legislative" process that involved the input of several prison officials in

7

1   various CDC departments.[3]  Defendants contend that although they
2   contributed to and commented upon the proposed policy, they could
3   not have prevented its modification or implementation, or changed
4   it once it was promulgated. (Defs.' Mot. at 10).

5           Even if the court draws all inferences in favor of
6   plaintiffs and assumes that Myers, Tristan and Cambra had
7   significant control over the promulgation and modification of the
8   policy, these defendants cannot be held liable because the policy
9   at issue was constitutionally valid.  The identical use of force
10  policy was considered by the Ninth Circuit in Jeffers v. Gomez,
11  267 F.3d at 915.  In Jeffers, the court found that this policy
12  was constitutionally valid and held that the CDC Director was
13  entitled to qualified immunity on claims related to it.  Id. at
14  914, 918.  Thus, under Jeffers the same policy at issue here is
15  not so deficient that it is "itself a repudiation of
16  constitutional rights."  Id. at 914.

17          Plaintiffs allege that Myers, Tristan, and Cambra
18  exhibited deliberate indifference to the constitutional rights of
19  Torres by authorizing policies and practices that were different
20  from the use of force policy as written.  They argue that the
21  policy as implemented condoned the use of force on inmates in

22

23          [3]   In 1993, Tristan formed a committee which included
    Myers and Cambra to review the CDC use of force policy in effect
24  at that time.  (Tristan Decl. 6-8).  This committee drafted a
    proposal to revise the policy, and the proposal was forwarded to
25  various departments and personnel including the Chief of
    Institution Service Unit, CDC's Staff Counsel, CDC Cabinet
26  members, the Chief Deputy Director of Administrative Services,
    the Policy and Regulation Unit, and the Office of Administrative
27  Law.  (Id.).  After the policy was approved, it was published by
    the CDC as Restricted Administrative Bulletin No. 95/3R. (Defs.'
28  Mot. Ex. A).

1  less than life threatening situations. (Pls.' Opp'n at 21).

2        To establish a prison official's deliberate
3  indifference in violation of the Eighth Amendment, plaintiffs
4  must show that the official "knows of and disregards an excessive
5  risk to inmate health or safety." Farmer v. Brennan, 511 U.S.
6  825, 837 (1994). "[T]he official must both be aware of facts
7  from which the inference could be drawn that a substantial risk
8  of serious harm exists, and he must also draw the inference." Id.
9  Unless there exists a "a sufficient causal connection" between
10 defendants' conduct and the alleged constitutional violation,
11 defendants cannot be liable under § 1983.  Jeffers, 267 F.3d at
12 915; Leer, 844 F.2d at 634 (holding that in order to recover
13 damages under § 1983 for an Eighth Amendment violation, plaintiff
14 must show that prison official was deliberately indifferent and
15 that this indifference was the actual and proximate cause of the
16 violation).

17       Plaintiffs present no evidence to support their
18 allegations that in contributing to the development of policies
19 related to the use of force, defendants were deliberately
20 indifferent in the sense that they knew of and disregarded a
21 substantial risk to inmate safety.  Plaintiffs have failed to
22 raise a triable issue of fact that there was any causal
23 connection between defendants' policy-level conduct and the
24 alleged constitutional violation.

25       Because no reasonable jury could find that a
26 constitutional right was violated under the facts alleged by
27 plaintiffs, there is "no necessity for further inquiries
28 concerning qualified immunity." Saucier, 121 S.Ct. at 2156.

1 Thus, defendants are entitled to summary judgment on all claims
2 pertaining to CDC and HDSP use of force policies.

3       2. <u>Integrated Yard Policy</u>

4      Plaintiffs further allege that defendants promulgated
5 and enforced an unconstitutional integrated yard policy that did
6 not "provide for circumstances under which, the safety of inmates
7 must be taken into account, prior to forcing the inmates to [be]
8 integrated in the same yard." (Pls.' Opp'n at 41). Because
9 defendants did not participate in the modified release of inmates
10 on February 4, 1998, plaintiffs' claims can only be analyzed in
11 the context of defendants' policy-level activities.

12      Unless a policy is "so deficient that the policy itself
13 is a repudiation of constitutional rights," an official who
14 promulgates the policy is entitled to qualified immunity.
15 <u>Jeffers</u>, 267 F.3d at 914. The general policy of integrating
16 inmates of various ethnic groups is a policy of not racially
17 segregating inmates. In <u>Cruz v. Bento</u>, 405 U.S. 319, 321 (1972),
18 the Supreme Court suggested that a state-wide policy of
19 segregating prison yards may be unconstitutional. <u>Id</u>. (finding
20 that "racial segregation, which is unconstitutional outside
21 prisons, is unconstitutional within prisons, save for the
22 necessities of prison security and discipline.").

23      In addition, the evidence shows that various measures
24 existed at HDSP to ensure the safety of inmates. (Tristan Decl.
25 at 3-6). Each inmate is evaluated by Classification Staff
26 Representatives ("CSR") who assign the inmate a classification
27 score used to determine the inmate's initial placement or
28 housing. (<u>Id</u>.). Inmates are assessed throughout their

incarceration and their classification may change depending on various factors including their propensity for violence. (Id.). A prison may be required to institute a lockdown of groups of inmates or an entire prison as a result of violent outbreaks. (Id.). Inmates on lockdown status are restricted from access to normal prison programs and activities. Custodial staff work with inmate groups to resolve their problems so that they can return to normal programming. (Id.). This may involve coordinating meetings and negotiations with various inmates and evaluating information from custodial staff and informants. (Tristan Dep., Pls.' Opp'n Ex. 6 at 33-37). When prison staff have determined that inmates have resolved their problems and it is safe to return them to normal programming, staff will implement modified release procedures to integrate inmates and return the prison to normal operation. (Tristan Decl. at 5).

Plaintiffs cite Tristan's testimony as evidence that prison officials knew of and disregarded the potential for a retaliatory, violent outbreak among inmates on February 4, 1998. In his deposition, Tristan stated the following:

> There's times in which I personally was involved in unlocking a prison after a major riot. I was given assurances by everyone involved that everything was settled, that the differences had been settled. We let out the inmates, and within a few minutes there's a big riot and the subsequent riot is worse than the first one and we have to lock down the institution again, and then we start all over again, but we cannot be as a prison system on perpetual lockdown. We have to try to get the inmates to program successfully as best we can.

(Tristan Dep., Pls.' Opp'n Ex. 6 at 38). This testimony suggests that prison lockdown and release procedures, designed to balance often conflicting penological interests, are fraught with

11

unpredictability.  However, this testimony does not raise an
inference that a substantial risk of serious harm to Torres and
other inmates on February 4, 1998 was known to and disregarded by
defendants Myers, Tristan, and Cambra.  The Supreme Court has
cautioned that

> Prison administrators ... should be accorded
> wide-ranging deference in the adoption and execution of
> policies and practices that in their judgment are
> needed to preserve internal order and discipline and to
> maintain institutional security.  That deference
> extends to a prison security measure taken in response
> to an actual confrontation with riotous inmates, just
> as it does to prophylactic or preventive measures
> intended to reduce the incidence of these or any other
> breaches of prison discipline.  It does not insulate
> from review actions taken in bad faith and for no
> legitimate purpose, but it requires that neither judge
> nor jury freely substitute their judgment for that of
> officials who have made a considered choice.

Whitley v. Albers, 475 U.S. 312, 321-22 (1986) (citing Bell v.
Wolfish, 441 U.S. 520, 547 (1979)) (internal quotations omitted).
Plaintiffs present no evidence that defendants "knew of and
disregard[ed] an excessive risk to inmate health or safety" in
relying on the policies and procedures to ensure inmate safety.
Farmer, 511 U.S. at 837.  Plaintiffs do not raise a triable issue
demonstrating that defendants were deliberately indifferent in
promulgating policies concerning the classification, housing, or
release of inmates, or that they ratified policies or practices
among custodial staff that promoted integrated release in order
to trigger violent altercations among inmates.

Absent evidence of a causal link between defendants'
conduct and the alleged constitutional violations, defendants are
entitled to summary judgment on claims related to the integrated
yard policy.

12

3.  <u>Shooting Review Board</u>

Plaintiffs further allege that prison officials at HDSP failed to conduct a proper investigation of the shooting incident.  Defendants Myers, Tristan, and Cambra did not participate in the investigation, thus this claim can only be analyzed in the context of their policymaking activities.

CDC's Shooting Review Policy provides that a Shooting Review Board ("SRB") will investigate a shooting incident to determine if the discharge of a firearm complied with CDC's use of force policy.  (Defs.' Mot. at 7).  Plaintiffs note that Regional Administrator Mike Pickett, who was the direct subordinate of Tristan, selected the chairperson and members of the Shooting Review Board. (Pls.' Opp'n at 44).  They contend that defendants did not engage in meaningful review of lethal shootings, but rather ratified all shootings including those not in compliance with the written use of force policy.  (Pls.' Opp'n at 43).

On its face, the Shooting Review policy is not "so deficient that the policy itself is a repudiation of constitutional rights."  <u>Jeffers</u>, 267 F.3d at 914.  Rather, it is a neutral policy designed to monitor compliance with CDC guidelines regarding the use of force by prison staff. Plaintiffs present no evidence that defendants enacted or enforced the Shooting Review Policy with deliberate indifference.

Plaintiffs evidence also does not support their allegations that defendants encouraged or condoned cursory investigations of shootings.  (Schwartz Decl. at 10-14). Furthermore, plaintiffs' evidence does not raise a triable issue

13

1   of fact that defendants were deliberately indifferent to inmate
2   safety because they did not reject the SRB findings relating to
3   the February 4, 1998 incident.[4]  Plaintiffs allegations that the
4   SRB conducted an inadequate investigation in this case does not,
5   absent specific evidence, raise an inference that defendants
6   promoted a custom or pattern of inadequate investigations, or
7   encouraged SRBs to exonerate staff members who violated the use
8   of force policy as a matter of course.

9        Thus, defendants are entitled to summary judgment on
10  all claims pertaining to the shooting review policy and SRB
11  investigation.

12              4.  Failure to Train

13       Plaintiffs further allege that defendants failed to
14  oversee the proper training, supervision, and discipline of
15  correctional officers at HDSP, resulting in the inappropriate use
16  of deadly force against Torres.

17       It does not appear that these defendants were
18  responsible for developing or implementing training.  According
19  to defendants, a CDC Training Advisory Committee ("TAC") was
20  responsible for developing and implementing training of custodial
21  staff on the use of force policy in effect on February 4, 1998.
22  (Id.).  The training program included a discussion of the use of
23  force policy, including circumstances when lethal force is
24  justified.  (Defs.' Mot. Ex. B).  The program also involved a
25  series of hypothetical scenarios in which officers were required

26
27       [4]  Plaintiffs cannot state a claim against Myers for the
28  investigation related to the February 4, 1998 incident, as he had
    already retired before this time.

                              14

to determine what level of force would be appropriate to quell various types of disturbances.  (Id.).

A Director's Use of Force Meeting, which was attended by Tristan and Cambra, was convened in July 1998 to evaluate the SRB report on the February 4, 1998 shooting incident.  The minutes from the meeting stated the following:

> The SRB report found the discharge of lethal rounds to stop an assault on an inmate was in compliance with departmental policy.  The SRB did recommend additional training clarifying the shooting policy.  The Committee had several concerns regarding the incident and directed the SRB to further examine the report and address the concerns, which will be reviewed again by the Committee at a future hearing.

(Pls.' Opp'n Ex. 42).  Plaintiffs argue that this statement indicates that the defendants knew that CDC use of force training was inadequate.  (Pls.' Opp'n at 34).

Plaintiffs also cite the deposition of correctional officer Abney in support of their argument.  Abney stated that the lethal force policy has changed since February 4, 1998, in that now officers are taught to shoot to "stop" rather than to shoot to "disable."  (Abney Dep. at 210).  Abney contended that there is no difference between the terms "disable" and "stop," but that officers may have been confused as to what "disable" meant before the policy language change.  (Id. at 211).  Abney further testified that shooting to stop may now include shooting at center mass if necessary.  (Id.).

Plaintiff's evidence is insufficient to raise a triable issue that the alleged inadequacies in CDC's training program constituted an Eighth Amendment violation by the defendants.  In Jeffers, the Ninth Circuit determined that the [director] of the

15

CDC could not be held liable for the allegedly unconstitutional use of force by individual correctional officers under a failure-to-train theory.  Jeffers, 267 F.3d at 915-16.  There, the plaintiff, who was wounded by a rifle shot fired by an officer during a prison riot, argued that CDC officer training was inadequate in light of the Department's "shoot to disable" policy because officers were trained to shoot at center mass rather than at arms or legs.  Id.

The Ninth Circuit reasoned that "[n]one of these circumstances, however, supports the conclusion that an inadequacy in CDC's training program led to a deliberate violation by [the Director] of [the plaintiff's] Eighth Amendment rights."  Id. at 916.  The court concluded that even if the allegations of inadequate training were taken as true, the deficiencies were "insufficient to establish, even circumstantially, that a substantial risk of serious harm to inmates was known" to the Director.  Id. at 917.

Here, plaintiffs have not presented evidence that Myers, Tristan, or Cambra conducted themselves in a "reckless or malicious manner, or that [their] actions were, in fact, deliberate."  Id. at 916.  The fact that Myers, Tristan, and Cambra were responsible for the general supervision and management of staff is not enough to raise an inference that their conduct caused the alleged constitutional violation, absent evidence that they were deliberately indifferent in the promulgation of CDC training, supervision, and disciplinary policies.

Because plaintiffs have not raised a triable issue of a

16

constitutional violation, defendants Myers, Tristan, and Cambra
are entitled to summary judgment on these issues.

### 5. Warden Susan Yearwood

Plaintiffs contend that Warden Susan Yearwood's
shortcomings in overseeing HDSP led to the improper enforcement
of the CDC lethal force policy.  Plaintiffs allege that Myers,
Tristan, and Cambra had knowledge of Yearwood's alleged
shortcomings and of another shooting incident at HDSP that
occurred prior to February 4, 1998, while the prison was under
Yearwood's management.  (Pls.' Opp'n at 26).  They suggest that
defendants' recommendation of Yearwood for appointment to the
warden position, and their subsequent failure to properly
supervise her and promptly remove her despite this knowledge,
caused the alleged constitutional violation through improper
enforcement of the written use of force policy.  (Pls.' Opp'n at
25-26).

Plaintiffs' evidence demonstrates that Tristan and
Cambra were aware of Yearwood's performance as HDSP warden and
participated in discussions related to her removal.[5]  (Tristan
Dep., Pls.' Opp'n Ex. 8; Cambra Dep., Pls.' Opp'n Ex. 65).
Plaintiffs present evidence that Yearwood displayed "bizarre
behaviors" such as a preoccupation with toy cars and "trinkets."
(Cambra Dep., Pls.' Opp'n Ex. 65, Terhune Dep., Pls.' Opp'n Ex.
12).

Because Myers, Tristan, and Cambra cannot be held

---

[5]     Under California Penal Code § 6050, wardens are
appointed by the Governor upon the recommendation of the CDC
Director, and are subject to removal by the Director.  Cal. Penal
Code § 6050.

1  liable for the actions of subordinates on a theory of vicarious
2  liability under § 1983, plaintiffs must show a causal link
3  between their actions and the alleged constitutional violation.
4  Jeffers, 267 F.3d at 915.  Merely alleging that HDSP was poorly
5  managed at the time of the incident is insufficient to establish
6  a deliberate violation by the defendants of Torres'
7  constitutional rights.  To raise a triable issue of fact under
8  the Eighth Amendment, plaintiffs must show that defendants knew
9  of and disregarded an excessive risk to inmate safety.  Farmer,
10 511 U.S. at 837.  They must also show that defendants' deliberate
11 indifference was the actual and proximate cause of the violation.
12 Leer, 844 F.2d at 634.

13        Plaintiffs have produced no evidence demonstrating that
14 defendants' knowledge of Yearwood's alleged shortcomings
15 manifested deliberate indifference, namely that they had
16 knowledge that her performance would create an excessive risk of
17 constitutional violations and that they failed to respond
18 accordingly.  Furthermore, defendants' knowledge of one other
19 shooting incident that occurred at HDSP prior to February 4, 1998
20 does not compel an inference of deliberate indifference and an
21 affirmative link to the alleged constitutional deprivation.
22 Jeffers, 267 F.3d at 915.  In Jeffers, the Ninth Circuit rejected
23 a district court's conclusion that the CDC Director's knowledge
24 of a high number of previous prison shootings could overcome
25 qualified immunity, where the lethal force policy in effect at
26 the time of the plaintiff's injury was constitutional.  Id.  The
27 court reasoned that "[u]nder this reading a CDC Director would
28 never prevail on qualified immunity on any claim for an injury in

1 a California prison."  Id.

2        Thus, defendants are entitled to summary judgment on
3 all claims related to their participation in the appointment,
4 removal, and supervision of Warden Yearwood.

5               6.  Emergency Medical Care

6        Plaintiffs' allege that prior to his death, Torres was
7 deprived of adequate emergency medical care in violation of his
8 Eighth Amendment rights.  (Pls.' Opp'n at 39).  Myers, Tristan,
9 and Cambra did not administer medical care to Torres, and contend
10 that they did not have the authority to supervise the
11 administration of medical care. (Defs.' Mot. at 21).  The
12 threshold question under the Eighth Amendment is whether prison
13 officials, acting with deliberate indifference, exposed an inmate
14 to a sufficiently substantial risk of serious damage to his
15 future health.  Farmer, 511 U.S. at 843.  To establish deliberate
16 indifference, plaintiffs must show that defendants knew of and
17 disregarded an excessive risk to the decedent's health.  Farmer,
18 511 U.S. at 837.

19        The evidence presented is insufficient, as a matter of
20 law, to establish that defendants acted with deliberate
21 indifference in the context of their policy-level activities
22 related to inmate medical care, or that defendants even
23 promulgated or authorized policies and practices related to
24 medical care.

25        Thus, defendants are entitled to summary judgment on
26 this issue.

27 ///

28 ///

19

1    D.   <u>Fourteenth Amendment Claims</u>

2         1.   <u>Torres' Placement on Lockdown</u>

3              Plaintiffs allege that Torres' due process rights were

4    violated when he was placed on lockdown status between November

5    24, 1997 and February 4, 1998 without notice or a hearing.  This

6    lockdown was a result of a prior incident in which members of the

7    "Southern Hispanics" group stabbed members of the "Others" group.

8    Torres and other inmates from both groups were placed on lockdown

9    status, which reduced their access to various programs and

10   activities for a limited period of time.  (Pls.' Opp'n at 6).

11   Defendant prison officials allege that Torres and other members

12   of his faction were placed on lockdown for their protection.

13             Because Myers, Tristan, and Cambra were not involved in

14   the decision to place Torres on lockdown, this claim can only be

15   analyzed in the context of their policymaking activities.  The

16   Supreme Court has emphasized that "[p]rison administrators ...

17   should be accorded wide-ranging deference in the adoption and

18   execution of policies and practices that in their judgment are

19   needed to preserve internal order and discipline and to maintain

20   institutional security."  <u>Whitley</u>, 475 U.S. at 321-22.  The Due

21   Process Clause is not violated where an inmate is transferred "to

22   less amenable and more restrictive quarters for nonpunitive

23   reasons" as these restrictions are "well within the terms of

24   confinement ordinarily contemplated by a prison sentence."

25   <u>Hewitt v. Helms</u>, 459 U.S. 460, 468 (1983).

26             Plaintiffs have not shown that Torres was restrained in

27   a manner that "impose[d] atypical and significant hardship ... in

28   relation to the ordinary incidents of prison life."  <u>Sandlin v.</u>

1   Conner, 515 U.S. 472, 484 (1995).  Plaintiffs' evidence is
2   insufficient to establish a genuine issue of a Fourteenth
3   Amendment violation arising out of Torres' placement on lockdown.
4             2.  Plaintiffs' Substantive Due Process Claim
5             Plaintiffs claim that they were denied their Fourteenth
6   Amendment right to a familial relationship with Torres.  (Am.
7   Compl. ¶¶ 94, 95).  Parents and children of a person killed by
8   state officials may assert a due process claim based on loss of
9   companionship.  Moreland v. Las Vegas Metropolitan Police, 159
10  F.3d 365, 371 (9th Cir. 1998) (reasoning that Fourteenth
11  Amendment claim brought by survivors was "based on the related
12  deprivation of their liberty interest arising out of their
13  relationship with [the decedent]") (citing Curnow v. Ridgecrest
14  Police, 952 F.2d 321, 325 (9th Cir. 1991)).  Plaintiffs'
15  Fourteenth Amendment rights to the companionship of Torres,
16  however, derive from the decedent's constitutional rights.
17  Johnson v. City of Oakland, No. C-97-283, 1997 WL 776368, at *4
18  (N.D. Cal. Dec. 3, 1997) (citing Smith v. Fontana, 818 F.2d 1411,
19  1420 (9th Cir. 1987)); see also Rhyne v. Henderson, 973 F.2d 386,
20  391 (5th Cir. 1992) (finding that mother's liberty interest
21  failed where evidence failed to establish underlying
22  constitutional violation of decedent's rights).  Because the
23  court finds that the defendants did not violate Torres'
24  constitutional rights, plaintiffs' Fourteenth Amendment claim
25  also fails.
26            3.  Equal Protection Claim
27            Plaintiffs allege that Torres was also denied his right
28  to equal protection under the Fourteenth Amendment.  (Am. Compl.

                                21

1  ¶ 68).  This claim fails because plaintiffs present no evidence

2  raising a triable issue of fact that Torres was treated

3  differently from similarly situated persons with respect to the

4  lockdown, yard release, use of force, or medical care.  See City

5  of Cleburne v. Cleburne Living Center, 473 U.S. 432, 439 (1985).

6         E.   Section 1985 Claim

7              Plaintiffs allege that the defendants conspired to

8  release rival gang members into the yard knowing that they would

9  fight with one another.  (Am. Compl. ¶ 75).  Plaintiffs contend

10 that the defendants manipulated facts to justify Torres' death,

11 fabricated investigation and autopsy reports, and destroyed

12 evidence demonstrating that Torres was an innocent victim.  (Am.

13 Compl. ¶¶ 76, 77, 81).  They also allege that defendants

14 conspired to enforce the integrated yard policy knowing that it

15 would result in violence, and an unwritten lethal force policy

16 which encouraged officers to shoot inmates for unlawful reasons.

17 (Am. Compl. ¶¶ 82-84).  These allegations are not supported by

18 the evidence.

19             To state a claim under 42 U.S.C. § 1985 for conspiracy

20 to interfere with civil rights, plaintiffs must include an

21 allegation of racial or class-based animus.  Usher v. City of Los

22 Angeles, 828 F.2d 556, 561 (9th Cir. 1987) ("To establish racial

23 or class-based animus, a plaintiff must show 'invidiously

24 discriminatory motivation ... behind the conspirators'

25 action.'") (citing Griffin v. Breckenridge, 403 U.S. 88, 102

26 (1971)).  Furthermore, allegations under § 1985 must be supported

27 by specific facts.  Karim-Panahi v. Los Angeles Police Dept., 839

28 F.2d 621, 626 (9th Cir. 1988) ("A claim under this section must

allege facts to support the allegation that defendants conspired together.    A mere allegation of conspiracy without factual specificity is insufficient.").

Plaintiffs contend that the "Southern Hispanics," of which Torres was a member, is a protected class for the purpose of § 1985.   However, plaintiffs have produced no evidence suggesting the existence of racial or class-based animus on the part of defendants underlying a conspiracy to deprive the decedent of his civil rights.   Furthermore, plaintiffs present no facts suggesting that defendants acted jointly to deprive Torres of his constitutional rights.   Plaintiffs' allegations are insufficient, as a matter of law, to establish a § 1985 violation.[6]

F.   <u>Claims Against Defendants in their Official Capacity</u>

Plaintiffs have sued Myers, Tristan, and Cambra for damages in their individual and official capacities.   The Eleventh Amendment bars a suit for damages against a state official who is sued in his official capacity in federal court. <u>Kentucky v. Graham</u>, 473 U.S. 159, 169 (1985); <u>Dittman v. California</u>, 191 F.3d 1020, 1026 (9th Cir. 1999).   Plaintiffs' claims against Myers, Tristan, and Cambra in their official capacity are dismissed.

---

[6]    To the extent plaintiffs' request to add complaint allegations in support of the § 1985 claim can be construed as a motion for leave to amend their complaint, this motion is DENIED. Allowing plaintiffs to amend the complaint at this stage in the litigation, after summary judgment motions have been filed, would be inappropriate under either the standard of Fed. R. Civ. P. 16(b) or the more liberal standard of Fed. R. Civ. P. 15.   More importantly, the evidence presented in opposition to defendants' motion is insufficient, regardless of the allegations of the complaint, to overcome defendants' motion.

1

G.   State Law Claims

2        Under 28 U.S.C. § 1367(c)(3), the court has discretion
3 to dismiss state law claims when it has dismissed all of
4 plaintiff's federal claims. "In the usual case in which federal
5 law claims are eliminated before trial, the balance of factors .
6 . . will point toward declining to exercise jurisdiction over the
7 remaining state law claims." Carnegie-Mellon Univ. v. Cohill,
8 484 U.S. 343, 350 n. 7 (1988); Schneider v. TRW, Inc., 938 F.2d
9 986, 993 (9th Cir. 1991). Some circuits have held that a court
10 may retain jurisdiction over state law claims if extraordinary or
11 unusual circumstances justify their retention. See, e.g., Musson
12 Theatrical, Inc. v. Federal Express Corp., 89 F.3d 1244, 1255
13 (6th Cir. 1996); Wentzka v. Gellman, 991 F.2d 423, 425 (7th Cir.
14 1993). However, here there has been no showing of extraordinary
15 or unusual circumstances. Accordingly, the court declines to
16 exercise supplemental jurisdiction under 28 U.S.C. § 1367(c) as
17 to the remaining state law claims.

18

H.   Defendants' Evidentiary Objections

19        Defendants have offered numerous evidentiary objections
20 to declarations submitted by plaintiffs in support of their
21 opposition, including the declarations of Jeffrey Schwartz,
22 Gaylan Warren, Steven Rigg, and Mary Torres. Defendants also
23 object to plaintiffs' Exhibits 10 and 22 and to plaintiffs'
24 "Notice of Lodgment of Copies of Documents and Photographs."
25 Although these objections have merit, the court does not need
26 to consider the objections in light of its conclusion that
27 plaintiffs' evidence does not raise a triable issue of fact

28

24

1 | sufficient to defeat defendants' motion for summary judgment.[7]

2 |        IT IS THEREFORE ORDERED that defendants' motion for

3 | summary judgment with respect to the federal causes of action

4 | against Myers, Tristan, and Cambra be, and the same hereby is,

5 | GRANTED.  The remaining state claims are DISMISSED pursuant to 28

6 | U.S.C. § 1367(c).

7 | DATED: January 9, 2002

8 | WILLIAM B. SHUBB

9 | UNITED STATES DISTRICT JUDGE

---

[7]     Plaintiffs complain generally about "spoilation of evidence" and discovery abuses by Myers, Tristan, Cambra and other defendants.  Plaintiffs' motion to compel evidence including bullet fragments and casings from the February 4, 1998 shooting was considered and denied by this court on October 3, 2001.  Furthermore, plaintiffs have had ample opportunity to file, and have filed, numerous discovery-related motions before this court and the magistrate judge.  Finally, this court has bent over backwards to address plaintiffs' concerns and ensure fairness in the discovery process, for example by taking discovery away from the magistrate judge and personally presiding over the parties' depositions.

United States District Court
for the
Eastern District of California
January 9, 2002


* * CERTIFICATE OF SERVICE * *


2:98-cv-02211


Estate Torres

   v.

Terhune

_____

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Eastern District of California.

That on  January 9, 2002, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office, or, pursuant to prior authorization by counsel, via facsimile.


Roger E Naghash                    SH/WBS
Law Offices of Roger E Naghash
One Newport Place
1301 Dove Street
Suite 1000
Newport Beach, CA  92660-2478

Michael J Williams
Attorney General's Office of the State of California
PO Box 944255
1300 I Street
Suite 125
Sacramento, CA  94244-2550

Gregory Scott Walston
Attorney General's Office of the State of California
455 Golden Gate Avenue
Suite 11000
San Francisco, CA  94102-3664

Jesse Manuel Rivera
Moreno and Rivera
1451 River Park Drive
Suite 205
Sacramento, CA  95815

Van Longyear
Longyear O'Dea and Lavra
3620 American River Drive
Suite 230
Sacramento, CA  95864-5923

Bruce Alan Kilday
Angelo Kilday and Kilduff
601 University Avenue
Suite 150
Sacramento, CA  95825

John Andrews Mason
Adams and Mason
PO Box 19937
730 Alhambra Boulevard
Suite 202
Sacramento, CA  95816

                              Jack L. Wagner, Clerk

                         BY:  _____
                              Deputy Clerk