FILED

JAN - 9 2002

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
　　　　　DEPUTY CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

ESTATE OF SOLOMON ELI TORRES,
et al.,

       Plaintiffs,

   v.

CAL A. TERHUNE, et al.,

       Defendants.

NO. CIV. S-98-2211 WBS/GGH

MEMORANDUM AND ORDER

RE: R. Abney, J. Bartley, T.
Bates, A. Bigard, L. Runyon,
D. Viale, and V. Zumpano;
Motion for Summary Judgment

----oo0oo----

      Plaintiffs Estate of Solomon Torres, et al. sue

defendants Cal Terhune et al. for various federal constitutional

and state law claims.  Defendants R. Abney, J. Bartley, T. Bates,

A. Bigard, L. Runyon, D. Viale, and V. Zumpano, who were

correctional officers for the California Department of

Corrections ("CDC") at the time of the incident giving rise to

this suit, move for summary judgment pursuant to Federal Rule of

Civil Procedure 56.

///

///

1

544

1  I.   Factual and Procedural Background

2         Plaintiffs allege that defendant prison officials shot

3  and killed Solomon Eli Torres aka David Solomon Torres

4  ("Torres"), an inmate at California's High Desert State Prison

5  ("HDSP"), during a prison-yard altercation between inmates

6  belonging to the "Southern Hispanics" and "Others" factions on

7  February 4, 1998.

8         Plaintiffs allege that the altercation among the

9  "Southern Hispanics" and "Others" in February 1998 was in

10  retaliation for a prior incident in November 1997 in which two

11  inmates from "Southern Hispanics" stabbed two inmates from

12  "Others."[1]   (Pls.' Opp'n at 46-47).  As a result of the November

13  1997 incident, the two groups were placed on "lockdown" status,

14  which limited their access to various prison programs and

15  activities.  Torres was included among the "Southern Hispanics"

16  who were placed on lockdown.

17         On February 4, 1998, prison officials initiated a

18  release of inmates from both groups into the exercise yard.

19  Eight "Southern Hispanics" and ten "Others" were released from

20  their housing units into the yard in alternating groups of two.

21  (Pls.' Opp'n at 18, Ex. 14).  After ten "Others" inmates were

22  released, they started walking around the track close together,

23  and were ordered by the correctional officers to break up into

24

25         [1]    A HDSP memorandum summarizing events leading up to the
   February 4, 1998 incident suggests that the November 1997
26  incident involved four "Southern Hispanics" inmates and five
   "Others" inmates.   The November 1997 incident apparently occurred
27  in retaliation for an incident in August 1996, in which two
   inmates from the "Others" group assaulted a "Southern Hispanics"
28  inmate. (Pls.' Opp'n at 15, Ex. 5)

1 | smaller groups. (Pls.' Opp'n at 19).

2 |   The "Others" complied with this order, but shortly
3 | thereafter began "grouping up" again. Thereafter, the "Others"
4 | inmates ran toward and attacked the "Southern Hispanics". At
5 | this time, Runyon was in an observation tower and Viale was in a
6 | building control booth. Abney, Bartley, Bigard, and Zumpano,
7 | were inside the yard, while the location of Bates at the time of
8 | the incident is disputed. (Pls.' Opp. Stmt. of Undisputed Facts,
9 | hereinafter "Pls.' SUF" ¶ 10).

10 |   The incident report and depositions suggest that
11 | various officers responded to the melee by yelling "get down."
12 | Some officers sprayed the fighting inmates with OC pepper spray.
13 | Runyon fired three warning shots and Viale fired one warning shot
14 | from their Mini-14 rifles. Runyon also fired two shots for
15 | effect, and defendants concede that one of these bullets struck
16 | Torres in the back. (Defs.' Stmt. of Undisputed Facts,
17 | hereinafter "Defs.' SUF" ¶¶ 15-30). Defendants contend that
18 | Torres was moving back and forth and brutally kicking another
19 | inmate when he was shot, and that Runyon fired the shot to
20 | disable Torres. (Defs.' SUF ¶¶ 26, 30).

21 |   Plaintiffs dispute defendants' characterization of the
22 | incident. Plaintiffs allege that some officers did not intervene
23 | to stop the fighting with non-lethal means, because they sought
24 | to avoid being struck by flying bullets. (Pls.' SUF ¶¶ 18-20).
25 | Plaintiffs further contend that Torres was not struck by the
26 | bullet while he was standing up but rather "while he was on the
27 | ground being punched and stumped by other inmate(s)." (Pls.'
28 | Opp'n at 20).

1   Plaintiffs argue that the policies and practices
2 related to the use of lethal force in 1998 were unconstitutional.
3 (Compl. ¶ 64).  They further allege that defendants failed to
4 properly train and supervise correctional officers in the use of
5 lethal force against inmates.  (Compl. ¶ 69).

6   Plaintiffs contend that prior to the February 1998
7 altercation, defendants adopted an "integrated yard policy,"
8 under which inmates of various ethnic and factional affiliations
9 were sent into the yard.  (Compl. ¶ 95).  According to
10 plaintiffs, this environment was promoted despite prison
11 officials' knowledge of intercultural hostilities between inmates
12 and the likelihood of violent altercations when members of these
13 groups were released to the yard at the same time.

14   Defendants now move for summary judgment on various
15 grounds including qualified immunity.

16 II.  Discussion

17   The court must grant summary judgment to a moving party
18 "if the pleadings, depositions, answers to interrogatories, and
19 admissions on file, together with the affidavits, if any, show
20 that there is no genuine issue as to any material fact and that
21 the moving party is entitled to judgment as a matter of law."
22 Fed. R. Civ. P. 56(c).  The party adverse to a motion for summary
23 judgment may not simply deny generally the pleadings of the
24 movant; the adverse party must designate "specific facts showing
25 that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e);
26 Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  Simply put, "a
27 summary judgment motion cannot be defeated by relying solely on
28 conclusory allegations unsupported by factual data."  Taylor v.

4

1  List, 880 F.2d 1040, 1045 (9th Cir. 1989).  The non-moving party
2  must show more than a mere "metaphysical doubt" as to the
3  material facts.  Matsushita Elec. Indus. Co. v. Zenith Radio, 475
4  U.S. 574, 587 (1986).

5       A.  Qualified Immunity

6            A public official is entitled to qualified immunity if
7  the law governing the official's conduct was not clearly
8  established, or if under clearly established law he could have
9  reasonably believed that his conduct was lawful.  Jeffers v.
10 Gomez, 267 F.3d 895, 910 (9th Cir. 2001).  The defendant bears
11 the burden of establishing qualified immunity.  Crawford-El v.
12 Britton, 523 U.S. 574, 586-87 (1998).

13           The United States Supreme Court recently articulated
14 the following test for determining qualified immunity.  As a
15 threshold question, the court must ask: "Taken in the light most
16 favorable to the party asserting the injury, do the facts alleged
17 show the [official's] conduct violated a constitutional right?"
18 Saucier v. Katz, 121 S.Ct. 2151, 2156 (2001).  If the answer is
19 affirmative in that "a violation could be made out on a favorable
20 view of the parties' submissions, the next, sequential step is to
21 ask whether the right was clearly established."  Id. at 2156.
22 The Court emphasized that the "relevant, dispositive inquiry in
23 determining whether a right is clearly established is whether it
24 would be clear to a reasonable [official] that his conduct was
25 unlawful in the situation he confronted."  Id.  If the answer is
26 negative, the official is entitled to qualified immunity.

27           The Supreme Court has repeatedly "stressed the
28 importance of resolving immunity questions at the earliest

1 possible stage in litigation." <u>Hunter v. Bryant</u>, 502 U.S. 224,

2 227 (1991), <u>cited in</u> <u>Saucier</u>, 121 S.Ct. at 2156.  Where a

3 defendant seeks qualified immunity, courts are encouraged to make

4 a ruling on the issue "early in the proceedings so that the costs

5 and expenses of trial are avoided where the defense is

6 dispositive." <u>Id.</u> at 2156-57.

7       B.  <u>Eighth Amendment Limits on the Use of Force</u>

8           The law governing the use of force in the prison

9 context is well-settled.  "After incarceration, only the

10 'unnecessary and wanton infliction of pain' ... constitutes cruel

11 and unusual punishment forbidden by the Eighth Amendment."

12 <u>Whitley v. Albers</u>, 475 U.S. 312, 319 (1986) (citations and

13 internal quotations omitted).  To determine if a prison security

14 measure taken to quell a disturbance inflicted unnecessary and

15 wanton pain and suffering, a court must consider whether the

16 force "was applied in a good faith effort to maintain or restore

17 discipline or maliciously and sadistically for the very purpose

18 of causing harm."  <u>Id</u>. at 320-321; <u>see also</u> <u>Jeffers</u>, 267 F.3d at

19 910-11.  To be cruel and unusual punishment, the conduct "must

20 involve more than ordinary lack of due care for the prisoner's

21 interests or safety" and evince "obduracy and wantonness, not

22 inadvertence or error in good faith."  <u>Whitley</u>, 475 U.S. at 319.

23           Some of the factors that may be considered by district

24 courts in assessing an alleged Eighth Amendment violation include

25 the need for the application of force in a particular

26 circumstance, the relationship between that need and the amount

27 of force actually inflicted, and the extent of injury inflicted.

28 <u>Id.</u> at 320.  A court should also evaluate the "extent of the

threat to the safety of staff an inmates" as reasonably perceived by prison officials, and "any efforts made to temper the severity of a forceful response." Id.

The Supreme Court has emphasized that evidence of improper motive underlying an alleged constitutional violation cannot be used to rebut a defense of qualified immunity. Crawford-El v. Britton, 523 U.S. 574, 588 (1998) (noting that "[e]vidence concerning the defendant's subjective intent is simply irrelevant" to qualified immunity defense). However, a defendant's mental state is relevant "where it is an element of the alleged constitutional violation" and thus is an essential component of the plaintiff's affirmative case. Id. at 589; Jeffers, 267 F.3d at 911. In order to survive summary judgment, plaintiffs must "put forward specific, nonconclusory factual allegations that establish improper motive causing cognizable injury." Crawford-El, 523 U.S. at 598 (internal quotations omitted).

In Jeffers v. Gomez, the Ninth Circuit held that an inmate shot by correctional officers during a major prison disturbance had to allege facts demonstrating that the officers shot at him, or permitted him to be shot, "because of an unconstitutional motive or state of mind." 267 F.3d at 911.

C. Eighth Amendment Claims under Section 1983

1. Use of Lethal Force by Runyon

a. Constitutional Violation

Considering the evidence in a light most favorable to plaintiffs, a reasonable jury could conclude that Runyon's firing

7

of the lethal shot constituted an Eighth Amendment violation.[2]
The CDC shooting policy in effect on February 4, 1998 provided
that:

> firearms shall only be used when reasonably necessary
> to prevent or stop escapes, the taking of hostages, or
> other circumstances which present an immediate danger
> of escape, loss of life, great bodily injury, or damage
> to a substantial amount of valuable property.

(Pls.' Opp'n at 12).   The policy further provided that firearms
"shall be used only as a last resort after other reasonable and
available resources have been considered and exhausted or are
determined to be clearly inappropriate in view of the immediate
need to use armed force." (Id. at 13).   The policy stated that
when necessary to fire at a person, the shot should be aimed to
disable rather than to kill. (Id. at 45).   Finally, the policy
provided that firearms were not to be used to stop "fist fights"
between inmates when there is no danger of death or great bodily
harm.   (Id.).   The identical use of force policy was considered
and determined to be constitutionally valid by the Ninth Circuit
in Jeffers v. Gomez, 267 F.3d at 915.

Defendants contend that Runyon fired his weapon
pursuant to and within the scope of the shooting policy in place
at the time of the incident. (Defs.' Mot. at 7-8).   Defendants
describe the situation as one in which an extremely violent melee
broke out among 18 inmates from rival ethnic groups.   Runyon and
other officers were screaming repeatedly for inmates to "get

---

[2]    The Supreme Court has emphasized that the Due Process
Clause of the Fourteenth Amendment affords no greater substantive
protection than does the Eighth Amendment in cases involving
claims of excessive force in the prison context.   Whitley, 475
U.S. at 327.   Thus, plaintiffs' claims are analyzed under the
Eighth Amendment.

8

down" and the inmates did not comply. (Defs.' Mot. at 2). Runyon fired three warning shots, Viale fired one warning shot, and some of the officers used pepper spray. Defendants contend that none of these methods worked to quell the disturbance, as some inmates stopped fighting temporarily and then started again. Defendants provide the following characterization of the incident:

> In coming to the decision to shoot for effect, Officer Runyon believed that it was an extremely brutal riot situation with multiple assailants on individuals who were on the ground not defending themselves. He felt the situation was out of control. He saw an inmate that appeared to be unconscious and not defending himself on the ground with multiple assailants kicking and hitting him, in what appeared to be lethal blows. Officer Runyon testified, "You pray you don't have to make the shot; I had to make the shot." He targeted an inmate, later identified as Torres, who was repeatedly kicking the defenseless inmate who was on the ground. He shot because he felt that inmate was suffering great bodily injury and potentially could be killed. In conformity with the Shooting Policy Officer Runyon aimed at the lower extremities of inmate Torres in an attempt to disable rather than kill. Officer Runyon was between 90 and 100 yards away, and the inmate, later identified as Torres, was moving quite a bit while administering multiple kicks to the inmate on the ground. The inmate he targeted and shot, later identified as Torres, fell to the ground. Shortly thereafter the inmates stopped fighting and the riot situation was brought under control.

(Defs.' Mot. at 2-3). After conducting an investigation of the shooting, the Shooting Review Board ("SRB") concluded that Runyon acted within the guidelines of the CDC shooting policy. (Pls.' Opp'n Ex. 41).

Plaintiffs contend that when Torres was shot, he was not standing up, moving back and forth, or inflicting lethal blows on another inmate. Plaintiffs argue that Torres was lying on the ground receiving repetitive blows to various parts of his body when Runyon fired his rifle at him.

1          Plaintiffs' evidence creates a disputed issue of fact
2   as to the position of Torres' when he was shot.  Autopsy
3   photographs indicate that the gunshot entry wound was located at
4   the lower right quadrant of his back near his spine.  (Pls.'
5   Opp'n Ex. 29).  The exit wound was located under his left
6   underarm.  (Pls.' Opp'n Ex. 30).  Autopsy photos also reveal a
7   large bruise on above his right eye on his forehead.  (Pls.'
8   Opp'n Ex. 28).  Plaintiffs point out that the shirt which Torres
9   was wearing on February 4, 1998 had no bullet entry hole,
10  suggesting that his "head was close to the ground with his back
11  slightly elevated" when the bullet entered his back.  (Pls.'
12  Opp'n at 20).

13          A declaration submitted by forensic pathologist
14  Sylvia Comparini, who performed a second autopsy on Torres' body,
15  contains the following conclusions:

16      The entry wound, the path of the bullet inside of
        Torres' body, the exit wound, Torres' shirt, the
17      contusion/abrasion on his knee, and arms and multiple
        rib fractures, indicate that Torres was either laying
18      on his left arm, in a fetal position, or kneeling down,
        with his head close to the ground, in a fetal position,
19      hugging himself, in an effort to deflect the blows he
        was receiving to his side and the ribs area.
20
    (Comparini Decl. at 17).
21
            Furthermore, in the incident report which he submitted
22
    on February 4, 1998, Runyon wrote the following:
23
        The victim, inmate Ifopo, appeared motionless and no
24      longer able to defend himself.  At this point I felt
        that I must intervene as great bodily injury was
25      immanent [sic] if not already existent.  I aimed the
        Mini 14 at the lower extremities of an assaulting
26      inmate who was kicking inmate Ifopo in the neck/head
        area and fired for effect.  I saw the assaulting
27      inmate, later identified as Torres ... drop to the
        ground and fighting ceased in circle #1.
28

                                10

1 The Shooting Review board noted in its report that based on
2 interviews with other staff witnesses, Ifopo was "observed to be
3 lying on the ground, appeared to be unconscious and defenseless,
4 sustaining serious injuries from kicks to his head area by Inmate
5 Torres ... and two other unidentified inmates."[3]   (Pls.' Opp'n
6 Ex. 41 at 1092).   However, the official incident report, which
7 listed the injuries sustained by various inmates involved in the
8 altercation noted that Ifopo only "sustained a reddened area to
9 the left side of his chin," whereas some of the other inmates
10 suffered blunt trauma, abrasions, and lacerations. (Pls.' Opp'n
11 Ex. 14).   The medical report documenting Ifopo's injuries
12 indicates that this inmate sustained redness on his left knee,
13 but that no bleeding or swelling was present.[4]   (Pls.' Opp'n Ex.
14 46).

15         Plaintiffs' evidence raises a triable issue of fact
16 with respect to Runyon's state of mind when he aimed and shot at
17 Torres.   To determine if a prison security measure taken to quell
18 a disturbance inflicted unnecessary and wanton pain and
19 suffering, a court must consider whether the force "was applied
20 in a good faith effort to maintain or restore discipline or
21 maliciously and sadistically for the very purpose of causing
22 harm."   Whitley, 475 U.S. at 320-321.   In Whitley, the Supreme

---

24     [3]     The parties dispute whether Ifopo was the inmate who
25 was allegedly being kicked by Torres when the decedent was shot.
(Defs.' Reply at 13-14).

26     [4]     The SRB report indicates that, according to the medical
27 report, Ifopo sustained injuries to his head and left knee.
(Pls.' Opp'n Ex. 41 at 1094).   While this medical report is
28 almost illegible, the court does not ascertain from it that Ifopo
suffered serious head injuries.   (Pls.' Opp'n Ex. 46).

1  Court emphasized than in evaluating various factors to determine
2  the existence of an Eighth Amendment violation, a court may draw
3  inferences "as to whether the use of force could plausibly have
4  been thought necessary, or instead evinced such wantonness with
5  respect to the unjustified infliction of harm as is tantamount to
6  a knowing willingness that it occur."   475 U.S. at 321.

7          Considering the facts in a light most favorable to
8  plaintiffs, a reasonable jury could conclude that the force
9  applied by Runyon may not have been applied "in a good faith
10 effort to maintain or restore discipline" and raises an inference
11 of impermissible motive.  Id.  The physical evidence presented by
12 plaintiffs, including Ifopo's reported injuries, is inconsistent
13 with the conclusion that Ifopo was being brutally kicked by
14 Torres in the head area when the latter was shot.  Furthermore,
15 Torres could not have posed a threat of imminent great bodily
16 injury or death to another inmate if he was indeed lying on the
17 ground and being beaten when Runyon aimed the rifle and shot at
18 him.  Under these facts, the application of force was
19 significantly greater than the need for it.  Id.  A reasonable
20 jury could find that Runyon's application of force by shooting
21 Torres, even if only intended to disable him, was clearly
22 unwarranted under the circumstances and may have been motivated
23 by a desire to cause harm.  See id. at 320; Saucier, 121 S.Ct. at
24 2156.

25              b.   Qualified Immunity Defense

26          In proceeding to the second question under Saucier, the
27 court must decide whether Runyon could reasonably have believed
28 that his conduct was lawful in the situation he confronted.   121

1 S.Ct. at 2159 ("The question is what the officer reasonably
2 understood his powers and responsibilities to be, when he acted,
3 under clearly established standards."). The Supreme Court
4 emphasized in Saucier that the "concern of the immunity inquiry
5 is to acknowledge that reasonable mistakes can be made as to the
6 legal constraints" on the conduct of state officials.[5] Id. at
7 2158.

8          In Saucier, the factual dispute rested on a
9 plaintiffs' claim that a police officer violated his Fourth
10 Amendment right by using excessive force to arrest him. Id. at
11 2155. The plaintiff, who was planning to protest the Vice
12 President's speech at a public event, was forcibly removed from
13 the audience by police officers and shoved into a police van.
14 Id. The Supreme Court assumed that there may have been a
15 constitutional violation in this case, but nevertheless found
16 that in light of the circumstances as the officers' perceived
17 them, the plaintiff may have posed a safety threat and the
18 officers' response was "within the bounds of appropriate police
19 responses." Id. at 2160. The Supreme Court confirmed that
20 qualified immunity operates "to protect officers from the
21 sometimes 'hazy border between excessive and acceptable force'
22 and to ensure that before they are subjected to suit, officers

23

24          [5]     In evaluating allegations of excessive force in the
25 Fourth Amendment context, the Supreme Court held that "the ruling
   on qualified immunity requires an analysis not susceptible of
26 fusion with the question whether unreasonable force was used in
   making the arrest." Saucier, 121 S.Ct. at 2153.  The Ninth
27 Circuit, evaluating an Eighth Amendment excessive force claim in
   Jeffers, interpreted Saucier as cautioning courts not to deny
28 summary judgment "any time a material issue of fact remains" on
   the underlying constitutional claim.  267 F.3d at 910-910.

13

are on notice their conduct is unlawful." Id. at 2158 (citations omitted).

Unlike the factual circumstances in Saucier, the factual dispute underlying this case does not fall within the "hazy border between excessive and acceptable force." Id. Here, Runyon contends that he reacted to what he believed was great bodily injury posed by Torres, who he and the other defendants say was brutally kicking another inmate. Runyon's theory is not that he targeted an inmate who was brutally kicking another inmate, and that he accidentally hit Torres. Rather, Runyon contends that he specifically targeted Torres as the aggressor.[6]

Plaintiffs, however, contend that defendants' characterization of the incident is inaccurate given the physical evidence indicating that Torres may have been the victim rather than the perpetrator of violence when he was shot. The facts in dispute here are not only whether the force applied to Torres was excessive, but also whether Torres' conduct even warranted the intentional use of force.

---

[6]    Defendants suggest that the court should accept their characterization of the incident.  Under defendants' version of the melee which paints Torres as an aggressor who was kicking another inmate in the head and neck, a reasonable officer could have believed that shooting Torres to disable him was lawful. The lethal wound inflicted would have been a tragic consequence, but not an automatic bar to a qualified immunity defense. However, this case is unique because both sides present probative yet contradictory evidence of the circumstances which led to the use of force.  If courts in such cases were to ignore material facts presented by plaintiffs any time a defendant raised a qualified immunity defense, it seems that state officials would be able to easily escape § 1983 liability by presenting a conflicting version of the facts showing that their conduct was lawful under the circumstances.

14

1          On summary judgment, the court must view the record and
2    submissions in the light most favorable to the nonmoving party.
3    Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) ("The
4    evidence of the non-movant is to be believed, and all justifiable
5    inferences are to be drawn in his favor.").  The court cannot
6    weigh evidence or make credibility determinations.  Id.  This
7    principle applies to cases involving a qualified immunity
8    defense.  Liston v. County of Riverside, 120 F.3d 965, 977 (9th
9    Cir. 1997).  Given the disputed issues of fact as to whether
10   Torres was a victim or an aggressor when he was intentionally
11   shot, the court cannot conclude that a reasonable officer in
12   Runyon's position would have believed that his conduct was lawful
13   in light of clearly established standards governing the use of
14   force during a prison disturbance.

15         Thus, defendant Runyon is not entitled to summary
16   judgment on the basis of qualified immunity on plaintiffs' claim
17   that the shooting violated Torres' Eighth Amendment rights.

18                    2. Liability of Abney, Bartley, Bates, Bigard, Viale,
19                    and Zumpano With Respect to the Use of Force

20         Plaintiffs present no evidence that any of the other
21   six correctional officers used lethal or non-lethal force on
22   Torres.  Plaintiff's only viable Eighth Amendment claim against
23   these defendants with respect to the use of force is that they
24   "could have intervened before the use of excessive force, but
25   failed and refused to do so ..." (Am. Compl. ¶ 71).

26         In Jeffers, the plaintiff alleged that two correctional
27   officers violated his Eighth Amendment rights during a prison
28   disturbance by failing to prevent each other from firing at him

                                    15

1  in a malicious manner.  267 F.3d at 912.  The Ninth Circuit found
2  that one officers' failure to prevent the other from firing did
3  not create an inference of impermissible motive where each
4  officer focused on quelling the disturbance rather on the actions
5  of his or her colleague.  Id.  The court found that there was no
6  evidence that each officer was aware that the other was acting in
7  a manner that violated the plaintiff's constitutional rights, or
8  that each had the opportunity to prevent the other's conduct.
9  Id.

10          Plaintiffs present no evidence showing that Abney,
11  Bartley, Bates, Bigard, Viale, or Zumpano knew that Runyon, who
12  was in the observation tower, was about to fire for effect.  They
13  cite deposition testimony indicating that Bartley pulled Abney's
14  shirt to hold him back when shots were fired, and that Bigard
15  testified that he "wasn't in a great big hurry to jump in the
16  middle of shots."  (Abney Dep., Defs.' Mot. Ex. A, Pls.' SUF ¶
17  18).  While this evidence suggests that defendants were
18  conscientious of their own safety during the melee, it does not
19  raise a triable issue that they were deliberately staying back to
20  watch inmates get shot rather than responding to the incident.
21  Furthermore, assuming that defendants knew that Runyon would
22  eventually fire for effect, there is no evidence that they could
23  have done anything to prevent him from shooting at the fighting
24  inmates.  The facts demonstrate that officers reacted in various
25  ways, including yelling "get down" and spraying the inmates with
26
27
28

16

pepper spray.[7]  Viale fired a warning shot, and the evidence
indicates that it was fired into an unoccupied grass area.
Defendants' failure to prevent Runyon from firing at Torres does
not create an inference of impermissible motive necessary to
raise a genuine issue of an Eighth Amendment violation.  Jeffers,
267 F.3d at 912.

Because no constitutional right would have been
violated under the facts alleged by plaintiffs, there is "no
necessity for further inquiries concerning qualified immunity."
Saucier, 121 S.Ct. at 2156.  Defendants Abney, Bartley, Bates,
Bigard, Viale, and Zumpano are therefore entitled to summary
judgment on claims related to the use of excessive force and
failure to prevent the use of excessive force.

### 3.  Yard Release and Protection of Inmates from Harm

It does not appear that any of these defendants made
the decision to release the inmates into the exercise yard, that
any of them had any influence as to the manner in which the
inmates were to be released, or that any of them knew that the
inmates were going to fight.  Defendants contend that they
learned about the decision to release the inmates from their
supervisors on the morning of February 4, 1998.  (Defs.' SUF ¶ 1-
2).

---

[7]    Plaintiffs submit unsworn statements written by inmates
who were witnesses to the incident, contending that no verbal
warnings were given.  (Pls.' Opp'n Ex. 22, 60).   One inmate
stated that he only heard shots fired. (Ex. 60).   However, two
other inmates stated that they heard "yard down" or "get down,"
while a fourth described the shots that he heard.  (Ex. 22, 60).
Notwithstanding evidentiary objections to these statements, they
are insufficient to create a triable issue that the officers only
responded by shooting.

1        The deliberate indifference standard governs
2  defendants' behavior in this context.  Jeffers, 267 F.3d at 913.
3  "A prison official is deliberately indifferent to a substantial
4  risk of serious harm to inmates if that official is subjectively
5  aware of the risk and does nothing to prevent the resulting
6  harm."  Id. (citing Farmer v. Brennan, 511 U.S. 825, 828-29
7  (1994)).  The official must "both be aware of facts from which
8  the inference could be drawn that a substantial risk of serious
9  harm exists, and he must also draw the inference."  Farmer, 511
10  U.S. at 837.

11        Plaintiffs present no evidence that raises an inference
12  that the defendants had "a sufficiently culpable state of mind"
13  to create a triable issue of their deliberate indifference toward
14  the safety of inmates.  Abney is the only officer whom plaintiffs
15  identify as having some involvement in the negotiations with
16  inmates that led up to the yard release on February 4, 1998.  An
17  internal memo written by Correctional Sergeant Boitano to
18  Facility Captain Stone, discussing events prior to the February
19  4, 1998 altercation, mentions that on January 21, 1998, Abney met
20  with Boitano, other staff members, and four inmates. (Pls.' Opp'n
21  Ex. 5).  The memo suggests that this meeting was one of several
22  meetings in which inmates discussed their differences and staff
23  members encouraged reconciliation so that the inmates could begin
24  programming together.  (Id.).  Abney's involvement in this
25  process is insufficient to raise a triable issue that he knew of
26  and disregarded a substantial risk of serious harm to inmates
27  when they were released into the yard on February 4, 1998.
28        The kind of evidence that courts have suggested would

18

give rise to an inference of deliberate indifference is entirely lacking here. In Robinson v. Prunty, 249 F.3d 862 (9th Cir. 2001), the Ninth Circuit affirmed a district court's denial of qualified immunity to correctional officers where there was a genuine issue of fact whether the officers were deliberately indifferent to a substantial risk that an inmate would be seriously harmed if he was placed in a racially integrated yard. In Prunty, an African-American inmate alleged that when he was released into the exercise yard on one occasion, he was attacked by a Mexican-American inmate and the correctional officers on duty watched the fight for about five minutes without attempting to stop it. Id. at 864. On another occasion, before another Mexican-American inmate was released into the yard with the plaintiff, one guard joked about a potential fight among the inmates, and another asked if tear gas would bother his asthma while other guards laughed. Id. at 864-65.

The Ninth Circuit found that the plaintiff's evidence "paint[ed] a gladiator-like scenario, in which prison guards are aware that placing inmates of different races in the yard at the same time presents a serious risk of violent outbreaks." Id. at 867. The court further noted that:

> The defendants awareness of and indifference to this risk is demonstrated by the alleged frequency with which such outbreaks occur, by the alleged jokes made by the guards to [the plaintiff] before they released a Mexican-American inmate into the yard with him, and by the alleged fact that the guards failed to intervene while [plaintiff] was attacked by another inmate.
> Id.

Plaintiffs contend that defendants had knowledge that the "Southern Hispanics" and "Others" groups had a history of

19

violence.   This history includes an incident in August 1996, in
which two inmates from the "Others" group assaulted a "Southern
Hispanics" inmate and an incident in November 1997 in which two
inmates from the "Southern Hispanics" stabbed two inmates from
"Others."   (Pls.' Opp'n at 14-15, Ex. 5).   They cite David
Tristan's deposition testimony, in which he stated:

> There's times in which I personally was involved in
> unlocking a prison after a major riot.  I was given
> assurances by everyone involved that everything was
> settled, that the differences had been settled.  We let
> out the inmates, and within a few minutes there's a big
> riot and the subsequent riot is worse than the first
> one and we have to lock down the institution again, and
> then we start all over again, but we cannot be as a
> prison system on perpetual lockdown.  We have to try to
> get the inmates to program successfully as best we can.

(Tristan Dep. at 38).   However, assuming that all of the
correctional officers knew of the prior incidents among the rival
groups, and understood that a release of rivals into the exercise
yard could trigger an altercation, plaintiffs evidence is still
insufficient to raise an inference of deliberate indifference.
Unlike the circumstances giving rise to the Prunty case,
plaintiffs' evidence is devoid of any facts suggesting that
defendants predicted or encouraged violent altercations among
inmates.   249 F.3d at 867.

Defendants Abney, Bartley, Bates, Bigard, Runyon,
Viale, and Zumpano are therefore entitled to summary judgment on
claims related to the yard release.

4.  Emergency Medical Care

Plaintiffs allege that prior to his death, Torres was
deprived of adequate emergency medical care in violation of his
Eighth Amendment rights.   (Pls.' Opp'n at 42-43).   They contend

20

1  that his gunshot injuries were survivable, and that failure to
2  perform specific medical procedures contributed to his death.
3  (Id.

4        The threshold question under the Eighth Amendment is
5  whether prison officials, acting with deliberate indifference,
6  exposed an inmate to a sufficiently substantial risk of serious
7  damage to his future health.  Farmer, 511 U.S. at 843.  To
8  establish deliberate indifference, plaintiffs must show that
9  defendants knew of and disregarded an excessive risk to the
10 decedent's health.  Farmer, 511 U.S. at 837.

11       There is no evidence that any of the officer defendants
12 administered medical care to Torres or that they even had medical
13 training that would enable them to affirmatively respond to
14 gunshot injuries.  There is no evidence that the officers ignored
15 Torres' need for medical care or prevented the rendering of care
16 following the shooting.  The incident report notes that Medical
17 Technical Assistants administered CPR to Torres and that Captain
18 Stone applied pressure to his wound.  (Pls.' Opp'n Ex. 14).
19 Plaintiffs dispute that CPR was actually performed and allege
20 that specific medical procedures, such as insertion of tubes to
21 relieve the pressure in his chest cavity, were not performed in a
22 timely manner.  (Pls.' Opp'n at 35-36).  However, plaintiffs
23 present no evidence that any of the individual officers acted in
24 a deliberately indifferent manner with respect to Torres' medical
25 treatment following the shooting.

26       Thus, defendants Abney, Bartley, Bates, Bigard, Runyon,
27 Viale, and Zumpano are entitled to summary judgment on the issue
28 of emergency medical care.

21

5.  Use of Force and Integrated Yard Policies; Failure
    to Train, Discipline, and Supervise; Shooting Review
    Board Investigation; Warden Yearwood; and Emergency
    Medical Care Policies

Defendants were correctional officers at the time of
the February 4, 1998 incident.  Because they did not have
supervisory or policymaking responsibilities, several of the
claims in the complaint are not relevant to these defendants.
Thus, plaintiffs' claims pertaining to CDC and HDSP use of force
policies, the integrated yard policy, training, supervision,
discipline, the Shooting Review Board investigation, policies
related to emergency medical care, and defendant Yearwood are
dismissed against defendants Abney, Bartley, Bates, Bigard,
Runyon, Viale, and Zumpano.

D.  Fourteenth Amendment Claims

1.  Torres' Placement on Lockdown

Plaintiffs allege that Torres' due process rights were
violated when he was placed on lockdown status between November
24, 1997 and February 4, 1998 without notice or a hearing.  This
lockdown was a result of a prior incident in which members of the
"Southern Hispanics" group stabbed members of the "Others" group.
Torres and other inmates from both groups were placed on lockdown
status, which reduced their access to various programs and
activities for a limited period of time.  (Pls.' Opp'n at 6).

Plaintiffs have presented no evidence indicating that
the officer defendants were involved in the decision to place
Torres' on lockdown.  In addition, plaintiffs' claim fails on the
merits.  The Supreme Court has emphasized that "[p]rison

22

1 administrators ... should be accorded wide-ranging deference in
2 the adoption and execution of policies and practices that in
3 their judgment are needed to preserve internal order and
4 discipline and to maintain institutional security." Whitley, 475
5 U.S. at 321-22. The Due Process Clause is not violated where an
6 inmate is transferred "to less amenable and more restrictive
7 quarters for nonpunitive reasons" as these restrictions are "well
8 within the terms of confinement ordinarily contemplated by a
9 prison sentence." Hewitt v. Helms, 459 U.S. 460, 468 (1983).

10          Plaintiffs have not shown that Torres was restrained in
11 a manner that "impose[d] atypical and significant hardship ... in
12 relation to the ordinary incidents of prison life." Sandlin v.
13 Conner, 515 U.S. 472, 484 (1995). Plaintiffs' evidence is
14 insufficient to establish a genuine issue of a Fourteenth
15 Amendment violation arising out of Torres' placement on lockdown.

16          2.  Plaintiffs' Substantive Due Process Claim

17          Plaintiffs claim that they were denied their Fourteenth
18 Amendment right to a familial relationship with Torres.  (Am.
19 Compl. ¶¶ 94, 95). Parents and children of a person killed by
20 state officials may assert a due process claim based on loss of
21 companionship. Moreland v. Las Vegas Metropolitan Police, 159
22 F.3d 365, 371 (9th Cir. 1998) (reasoning that Fourteenth
23 Amendment claim brought by survivors was "based on the related
24 deprivation of their liberty interest arising out of their
25 relationship with [the decedent]") (citing Curnow v. Ridgecrest
26 Police, 952 F.2d 321, 325 (9th Cir. 1991)). Plaintiffs'
27 Fourteenth Amendment rights to the companionship of Torres,
28 however, derive from the decedent's constitutional rights.

1  Johnson v. City of Oakland, No. C-97-283, 1997 WL 776368, at *4
2  (N.D. Cal. Dec. 3, 1997) (citing Smith v. Fontana, 818 F.2d 1411,
3  1420 (9th Cir. 1987)); see also Rhyne v. Henderson, 973 F.2d 386,
4  391 (5th Cir. 1992) (finding that mother's liberty interest
5  failed where evidence failed to establish underlying
6  constitutional violation of decedent's rights).

7         Because the court finds that Abney, Bartley, Bates,
8  Bigard, Viale, and Zumpano did not violate Torres' constitutional
9  rights, plaintiffs' Fourteenth Amendment claim against these
10 defendants fails.

11        Plaintiffs have raised a triable issue with respect to
12 the violation of plaintiffs' due process rights by defendant
13 Runyon.  In Moreland v. Las Vegas Metropolitan Police, 159 F.3d
14 at 372, the Ninth Circuit held that a "purpose to cause harm" is
15 necessary to establish a violation of due process rights to
16 family association, where the decedent was an innocent bystander
17 accidentally shot by police during a gunfight.  Although the
18 factual context of Moreland was not a prison disturbance, the
19 Ninth Circuit drew upon the Supreme Court's reasoning in
20 Sacramento v. Lewis, 523 U.S. 833, 854 (1998), that purpose to
21 cause harm is necessary for due process liability in cases
22 involving police pursuits, just as it is necessary for Eighth
23 Amendment liability in prison riot cases.  Id. (citing Lewis, 523
24 U.S. at 853 (1998)).  In Lewis, the Supreme Court held that only
25 a purpose to cause harm unrelated to a legitimate law enforcement
26 objective would satisfy "the element of arbitrary conduct
27 shocking to the conscience" which would be necessary for a due
28 process violation.  523 U.S. at 836.  The reasoning in Lewis and

                                24

1  <u>Moreland</u> suggests that the level of culpability necessary to
2  establish a violation of Torres' Eighth Amendment rights is the
3  same state of mind necessary to establish a violation of
4  plaintiffs' due process rights arising from Torres' death.

5           Here, plaintiffs have raised a triable issue of fact
6  that Runyon's shooting violated Torres' Eighth Amendment rights,
7  as their evidence raises an inference of impermissible motive
8  underlying the shooting.  Thus, plaintiffs' evidence raises a
9  triable issue with respect to plaintiffs' Fourteenth Amendment
10 claim against Runyon as well.

11          3.   <u>Equal Protection Claim</u>

12          Plaintiffs allege that Torres was also denied his right
13 to equal protection under the Fourteenth Amendment.  (Am. Compl.
14 ¶ 68).  This claim fails because plaintiffs present no evidence
15 raising a triable issue of fact that Torres was treated
16 differently from similarly situated persons with respect to the
17 lockdown, yard release, use of force, or medical care.  <u>See</u> <u>City</u>
18 <u>of Cleburne v. Cleburne Living Center</u>, 473 U.S. 432, 439 (1985).

19     E.   <u>Section 1985 Claim</u>

20          Plaintiffs allege that the defendants conspired to
21 release rival gang members into the yard knowing that they would
22 fight with one another.  (Compl. ¶ 75).  Plaintiffs contend that
23 the defendants manipulated facts to justify Torres' death,
24 fabricated investigation and autopsy reports, and destroyed
25 evidence demonstrating that Torres was an innocent victim.
26 (Compl. ¶¶ 76, 77, 81).  They also allege that defendants
27 conspired to enforce the integrated yard policy knowing that it
28 would result in violence, and an unwritten lethal force policy

                                25

1  which encouraged officers to shoot inmates for unlawful reasons.
2  (Compl. ¶¶ 82-84).  Plaintiffs' allegations are not supported by
3  the evidence.

4        To state a claim under 42 U.S.C. § 1985 for conspiracy
5  to interfere with civil rights, plaintiffs must include an
6  allegation of racial or class-based animus.  Usher v. City of Los
7  Angeles, 828 F.2d 556, 561 (9th Cir. 1987) ("To establish racial
8  or class-based animus, a plaintiff must show 'invidiously
9  discriminatory motivation ... behind the conspirators'
10 action.'") (citing Griffin v. Breckenridge, 403 U.S. 88, 102
11 (1971)).  Furthermore, to state a claim for conspiracy under §
12 1985, allegations must be supported by specific facts.  Karim-
13 Panahi v. Los Angeles Police Dept., 839 F.2d 621, 626 (9th Cir.
14 1988) ("A claim under this section must allege facts to support
15 the allegation that defendants conspired together.  A mere
16 allegation of conspiracy without factual specificity is
17 insufficient.").

18       Plaintiffs contend that the "Southern Hispanics," of
19 which Torres was a member, is a protected class for the purpose
20 of § 1985.  However, plaintiffs have produced no evidence
21 suggesting the existence of racial or class-based animus on the
22 part of defendants underlying a conspiracy to deprive the
23 decedent of his civil rights.  Furthermore, plaintiffs present no
24 facts suggesting that defendants acted jointly to deprive Torres
25 of his constitutional rights.  Plaintiffs' allegations are
26 insufficient, as a matter of law, to establish a § 1985
27
28

26

1  violation.[8]

2      F.   Claims Against Defendants in their Official Capacity

3          Plaintiffs have sued the seven defendants for damages

4  in their individual and official capacities.   The Eleventh

5  Amendment bars a suit for damages against a state official who is

6  sued in his official capacity in federal court.  Kentucky v.

7  Graham, 473 U.S. 159, 169 (1985); Dittman v. California, 191 F.3d

8  1020, 1026 (9th Cir. 1999).  Plaintiffs' claims against the seven

9  defendants in their official capacity are dismissed.

10     G. State Claims

11          1.  Defendant Runyon

12              a.   Wrongful Death

13          Under California Penal Code section 196, homicide

14  committed by a public officer is justifiable homicide if, inter

15  alia, it is "necessarily committed in overcoming actual

16  resistance to the execution of some legal process, or in the

17  discharge of any other legal duty."  Cal Penal Code § 196.  The

18  test for determining whether a homicide was justifiable under §

19  196 is "whether the circumstances reasonably create[d] a fear of

20  death or serious bodily harm to the officer or to another."

21  Martinez v. County of Los Angeles, 47 Cal. App. 4th 334, 349

22  (1996).

23  ─────────────

24      [8]    To the extent plaintiffs' request to add complaint
    allegations in support of the § 1985 claim can be construed as a
25  motion for leave to amend their complaint, this motion is DENIED.
    Allowing plaintiffs to amend the complaint at this stage in the
26  litigation, after summary judgment motions have been filed, would
    be inappropriate under either the standard of Fed. R. Civ. P.
27  16(b) or the more liberal standard of Fed. R. Civ. P. 15.  More
    importantly, the evidence presented in opposition to defendants'
28  motion is insufficient, regardless of the allegations of the
    complaint, to overcome defendants' motion.

1         Government Code section 820.2 similarly provides

2  immunity to a public employee from liability based on "an injury

3  resulting from his act or omission where the act or omission was

4  the result of the exercise of the discretion vested in him,

5  whether or not such discretion is abused." Cal. Gov't Code §

6  820.2. However, this statute does not confer immunity on

7  officers for discretionary acts involving the unreasonable use of

8  force. <u>Price v. County of San Diego</u>, 990 F. Supp. 1230 (S.D.

9  Cal. 1998) (holding that § 820.2 provided immunity to officers

10  who did not use excessive force in restraining plaintiff during

11  arrest).

12        For the same reasons that the court has determined that

13  plaintiffs have raised a genuine issue whether the shooting of

14  Torres constituted excessive force under the Eighth Amendment,

15  defendant Runyon is also not entitled to immunity under state

16  law.

17              b.  <u>California Civil Code Sections 52 and 52.1</u>

18        Plaintiffs seek damages pursuant to California Civil

19  Code §§ 52 and 52.1. Section 52.1 provides that a person may

20  bring a cause of action against anyone who interferes with the

21  exercise or enjoyment of constitutional or statutory rights. Cal

22  Civ. Code § 52; <u>Cabesuela v. Browning-Ferris Indus. of</u>

23  <u>California</u>, 68 Cal. App. 4th 101, 110 (1998). Section 52

24  provides for damages based on the violation of civil rights. Cal

25  Civ. Code § 52. To state a cause of action under § 52.1, a

26  plaintiff must establish the existence of violence or

27  intimidation by threat of violence. <u>Id.</u> at 111. California

28  courts have reasoned that § 52.1 must be read in conjunction with

1  § 51.7, which provides that persons have the right to be free
2  from violence or threat of violence committed because of their
3  membership in protected class.  Id. (citing Boccato v. City of
4  Hermosa Beach, 29 Cal. App. 4th 1797, 1809 (1994)).  Furthermore,
5  the violence or threatened violence must be due to plaintiff's
6  membership in a protected class set forth in § 51.7, or a group
7  similarly protected by constitution or statute from hate crimes.

8       Plaintiffs have not presented evidence raising a
9  triable issue of fact that any violence or threat of violence was
10 perpetrated against Torres due to racial animus or his membership
11 in a protected group.  Their evidence is insufficient, as a
12 matter of law, to establish a claim under Civil Code §§ 52 and
13 52.1.

14                c.  Intentional and Negligent Infliction of
15                    Emotional Distress

16      Plaintiffs' claims for intentional and negligent
17 infliction of emotional distress arises from their allegations
18 about the way in which prison officials treated them after
19 Torres' death.  Plaintiffs allege that defendants showed
20 insensitivity in handling his death and refused to release his
21 property and trust account funds.  (Am. Compl. ¶¶ 108-110).

22      The elements of a cause of action for intentional
23 infliction of emotional distress are (1) outrageous conduct by
24 the defendant; (2) intention to cause or reckless disregard of
25 the probability of causing emotional distress; (3) severe
26 emotional suffering; and (4) actual and proximate causation of
27 the emotional distress.  Cole v. Fair Oaks Fire Protection Dist.,
28 43 Cal.3d 148, 155 n.7 (1987).  Whether plaintiffs can recover

for negligent infliction of emotional distress depends on the traditional tort analysis of duty, breach of duty, causation, and damages.  Klein v. Children's Hospital Medical Center, 46 Cal. App. 4th 889, 895 (1996).

Plaintiffs' claims fail because they have presented no facts indicating that defendant Runyon had any involvement in the handling of Torres' body following his death, the disposition of the decedent's property, or discussions with the Torres family regarding these issues.  Because plaintiffs do not allege and present no evidence that defendant Runyon's conduct following Torres' death had any causal connection to their alleged emotional distress, plaintiffs' claims for intentional and negligent infliction of emotional distress against Runyon are dismissed.

> d. Negligent Supervision, Training, Hiring, and Retention

Plaintiffs' also present no evidence to support their claim against defendant Runyon for negligent supervision, training, hiring, and retention.  Prior to and on February 4, 1998, defendant Runyon was a correctional officer.  Plaintiffs do not allege and present no evidence that Runyon had supervisory, training, hiring, and retention responsibilities in the HDSP chain of command.  This claim against Runyon is therefore dismissed.

> 2.  State Law Claims Against Abney, Bartley, Bates, Bigard, Viale, and Zumpano

Because the court has dismissed all of plaintiffs' federal claims against defendants Abney, Bartley, Bates, Bigard,

1  Viale, and Zumpano, the court declines to exercise supplemental
2  jurisdiction under 28 U.S.C. § 1367(c) as to the state law claims
3  against these defendants.

4  Under 28 U.S.C. § 1367(c)(3), the court has discretion
5  to dismiss state law claims when it has dismissed all of
6  plaintiff's federal claims. "In the usual case in which federal
7  law claims are eliminated before trial, the balance of factors .
8  . . will point toward declining to exercise jurisdiction over the
9  remaining state law claims." Carnegie-Mellon Univ. v. Cohill,
10 484 U.S. 343, 350 n. 7 (1988); Schneider v. TRW, Inc., 938 F.2d
11 986, 993 (9th Cir. 1991). Some circuits have held that a court
12 may retain jurisdiction over state law claims if extraordinary or
13 unusual circumstances justify their retention. See, e.g., Musson
14 Theatrical, Inc. v. Federal Express Corp., 89 F.3d 1244, 1255
15 (6th Cir. 1996); Wentzka v. Gellman, 991 F.2d 423, 425 (7th Cir.
16 1993). However, here there has been no showing of extraordinary
17 or unusual circumstances.

18      H.   Evidentiary Objections

19      Defendants have filed with their reply objections to
20 plaintiffs' documentary exhibits and opposing statement of
21 undisputed material facts. Although these objections have merit,
22 the court does not need to consider the objections in light of
23 its conclusion that plaintiffs have submitted sufficient
24 admissible evidence to create a triable issue of fact warranting
25 denial of summary judgment to defendant Runyon. Defendants'
26 disagreements with the statements in Dr. Comparini's declaration
27 relate to issues of credibility and weight that would be
28 determined by a jury at trial, and are not relevant to the

31

1   admissibility of this declaration and the statements therein.
2   (Defs.' Reply at 12-13).

3          Furthermore, plaintiffs' evidence does not raise a
4   triable issue of fact sufficient to defeat summary judgment to
5   defendants Abney, Bartley, Bates, Bigard, Viale, and Zumpano.
6   Thus, the court does not need to consider defendants' evidentiary
7   objections.

8          Plaintiffs object to defendants' reply brief on the
9   basis that the reply sets forth new arguments.  Plaintiffs do not
10  identify what new arguments are set forth in the reply brief, and
11  the court does not ascertain new arguments that could be
12  construed as a "separate motion for summary judgment."  The court
13  finds that plaintiffs have not been prejudiced by defendants'
14  reply.[9]

15         IT IS THEREFORE ORDERED that:

16         (1) defendants' motion for summary judgment with
17  respect to plaintiffs' claim against defendant Runyon for
18  excessive force in violation of Torres' Eighth Amendment rights
19  be, and the same hereby is, DENIED.

20         (2) defendants' motion for summary judgment with

21

22         [9]    Plaintiffs complain generally about "spoilation of
23  evidence" and discovery abuses by the defendants.  Plaintiffs'
    motion to compel evidence including bullet fragments and casings
24  from the February 4, 1998 shooting was considered and denied by
    this court on October 3, 2001.  Furthermore, plaintiffs have had
25  ample opportunity to file, and have filed, numerous discovery-
    related motions before this court and the magistrate judge.
26  Finally, this court has bent over backwards to address
    plaintiffs' concerns and ensure fairness in the discovery
27  process, for example by taking discovery away from the magistrate
    judge and personally presiding over the parties' depositions.

28

                                32

1 | respect to plaintiffs' claim against defendant Runyon for
2 | violation of plaintiffs' Fourteenth Amendment due process rights
3 | be, and the same hereby is, DENIED.

4 | (3) defendants' motion for summary judgment with
5 | respect to the remaining federal claims against defendant Runyon
6 | be, and the same hereby is, GRANTED.

7 | (4) defendants' motion for summary judgment with
8 | respect to plaintiffs' state law claim against defendant Runyon
9 | for wrongful death be, and the same hereby is, DENIED.

10 | (5) defendants' motion for summary judgment with
11 | respect to the remaining state law claims against defendant
12 | Runyon be, and the same hereby is, GRANTED.

13 | (6) defendants' motion for summary judgment with
14 | respect to the federal claims against defendants Abney, Bartley,
15 | Bates, Bigard, Viale, and Zumpano be, and the same hereby is,
16 | GRANTED.

17 | (7) the remaining state law claims against defendants
18 | Abney, Bartley, Bates, Bigard, Viale, and Zumpano are DISMISSED
19 | pursuant to 28 U.S.C. § 1367(c).

20 | DATED: January 9, 2002

21 | 
22 | WILLIAM B. SHUBB
       UNITED STATES DISTRICT JUDGE

33

United States District Court
for the
Eastern District of California
January 9, 2002


* * CERTIFICATE OF SERVICE * *


2:98-cv-02211


Estate Torres

    v.

Terhune

---

I, the undersigned, hereby certify that I am an employee in the Office of
the Clerk, U.S. District Court, Eastern District of California.

That on  January 9, 2002, I SERVED a true and correct copy(ies) of
the attached, by placing said copy(ies) in a postage paid envelope
addressed to the person(s) hereinafter listed, by depositing said
envelope in the U.S. Mail, by placing said copy(ies) into an inter-office
delivery receptacle located in the Clerk's office, or, pursuant to prior
authorization by counsel, via facsimile.


      Roger E Naghash                    SH/WBS
      Law Offices of Roger E Naghash
      One Newport Place
      1301 Dove Street
      Suite 1000
      Newport Beach, CA  92660-2478

      Michael J Williams
      Attorney General's Office of the State of California
      PO Box 944255
      1300 I Street
      Suite 125
      Sacramento, CA  94244-2550

      Gregory Scott Walston
      Attorney General's Office of the State of California
      455 Golden Gate Avenue
      Suite 11000
      San Francisco, CA  94102-3664

      Jesse Manuel Rivera
      Moreno and Rivera
      1451 River Park Drive
      Suite 205
      Sacramento, CA  95815

Van Longyear
Longyear O'Dea and Lavra
3620 American River Drive
Suite 230
Sacramento, CA  95864-5923

Bruce Alan Kilday
Angelo Kilday and Kilduff
601 University Avenue
Suite 150
Sacramento, CA  95825

John Andrews Mason
Adams and Mason
PO Box 19937
730 Alhambra Boulevard
Suite 202
Sacramento, CA  95816


                                        Jack L. Wagner, Clerk

                                   BY: _____
                                        Deputy Clerk