**FILED**

JAN - 9 2002

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
DEPUTY CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

ESTATE OF SOLOMON ELI TORRES,
et al.,

                                    NO. CIV. S-98-2211 WBS/GGH
          Plaintiffs,

     v.                              MEMORANDUM AND ORDER

                                     RE: Gregory Harding, Mike
                                     Kelley, Gerald Marshall, and
                                     Alfred Stone; Motion for
                                     Summary Judgment
CAL A. TERHUNE, et al.,

          Defendants.
                         ----oo0oo----

          Plaintiffs Estate of Solomon Torres, et al. sue

defendants Cal Terhune et al. for various federal constitutional

and state law claims.  Defendants Gregory Harding, Mike Kelley,

Gerald Marshall, and Alfred Stone move for summary judgment

pursuant to Federal Rule of Civil Procedure 56.

I.   Factual and Procedural Background

          Plaintiffs allege that defendant prison officials shot

and killed Solomon Eli Torres aka David Solomon Torres

("Torres"), an inmate at California's High Desert State Prison

("HDSP"), during a prison-yard altercation between inmates

1

545

1  belonging to the "Southern Hispanics" and "Others" factions on
2  February 4, 1998.

3          Plaintiffs allege that the altercation among the
4  "Southern Hispanics" and "Others" in February 1998 was in
5  retaliation for a prior incident in November 1997 in which two
6  inmates from "Southern Hispanics" stabbed two inmates from
7  "Others."[1]  (Pls.' Opp'n at 24-25).  As a result of the November
8  1997 incident, the two groups were placed on "lockdown" status,
9  which limited their access to various prison programs and
10 activities.  Torres was included among the "Southern Hispanics"
11 who were placed on lockdown.

12         On February 4, 1998, prison officials initiated a
13 release of inmates from both groups into the exercise yard.
14 Stone designed and ordered the release, while Kelley and Marshall
15 supervised it.[2]  (Defs.' Stmt. of Undisputed Facts, hereinafter

16 _____

17      [1]   A HDSP memorandum summarizing events leading up to the
   February 4, 1998 incident suggests that the November 1997
18 incident involved four "Southern Hispanics" inmates and five
   "Others" inmates.  The November 1997 incident apparently occurred
19 in retaliation for an incident in August 1996, in which two
   inmates from the "Others" group assaulted a "Southern Hispanics"
20 inmate. (Pls.' Opp'n Ex. 5)

21      [2]   Plaintiffs dispute the nature and scope of defendants'
   authority on February 4, 1998 with respect to the supervision of
22 staff and other aspects of prison operation.  Defendants describe
   their position titles and duties as follows:  Stone was the
23 Facility Captain of "D" Facility at HDSP.  His duties included
   supervising custodial staff in Facility "D" which included
24 Cellblocks 1 through 8 on Yard #1 (Lower Yard) and Yard #2 (Upper
   Yard). (Defs.' SUF ¶¶ 9, 10).  Marshall was the program sergeant
25 assigned to Facility "D" and was in charge for the "D" program
   area. (Defs.' SUF ¶ 12).  Kelley was the yard sergeant assigned
26 to Yard #1 of Facility "D" and was responsible for Cellblocks 1
   through 4. (Defs.' SUF ¶ 14).  Boitano, who is not a defendant in
27 this case, was the yard sergeant assigned to Yard #2.  The inmate
   altercation and fatal shooting took place on Yard #2.  Defendant
28 Harding was not at HDSP on February 4, 1998. (Defs.' SUF ¶ 1).

2

1  "Defs.' SUF", ¶¶ 26-31).  Eight "Southern Hispanics" and ten
2  "Others" were released from their housing units into the yard in
3  alternating groups of two.  (Pls.' Opp'n at 29, Ex. 14).  After
4  ten "Others" inmates were released, they started walking around
5  the track close together.  Kelley and Marshall ordered
6  correctional staff to break the inmates up into smaller groups.
7  (Pls.' Opp'n at 29, Defs.' SUF ¶ 32).

8      The "Others" complied with this order, but shortly
9  thereafter began "grouping up" again.  Thereafter, the "Others"
10  inmates ran toward and attacked the "Southern Hispanics".

11      The incident report and depositions suggest that
12  various officers responded to the melee by yelling "get down."
13  Some officers sprayed the fighting inmates with OC pepper spray.
14  Correctional officer Runyon fired three warning shots and officer
15  Viale fired one warning shot from their Mini-14 rifles.  Runyon
16  also fired two shots for effect, and one of these bullets struck
17  Torres in the back.  (Pls.' Opp'n Ex. 14).  Defendants contend
18  that Torres was kicking another inmate in the head when he was
19  shot, and that Runyon fired the shot to protect this inmate.
20  (Defs.' SUF ¶¶ 36).

21      Plaintiffs dispute defendants' characterization of the
22  incident.  Plaintiffs allege that some officers did not intervene
23  to stop the fighting with non-lethal means, because they sought

24

25  Harding was the Chief Deputy Director for Support Services until
26  January of 1998, and thereafter the Assistant Deputy Director for
    Parole and Community Services.  (Defs.' SUF ¶¶ 2-3).  Harding
27  contends that his job classification between January 1998 and the
    present changed to Assistant Deputy Director of the Institutions
28  Division but that his duties remained the same.  (Defs.' SUF ¶¶
    3, 4).

1  to avoid being struck by flying bullets.  (Pls.' Opp'n at 30).
2  Plaintiffs further contend that Torres was not struck by the
3  bullet while he was standing up but rather "while he was on the
4  ground being punched and stumped by other inmate(s)."  (Pls.'
5  Opp'n at 30).

6        Plaintiffs argue that the policies and practices
7  related to the use of lethal force at HDSP in 1998 were
8  unconstitutional.  (Am. Compl. ¶ 64).  They further allege that
9  defendants failed to properly train and supervise correctional
10 officers in the use of lethal force against inmates.  (Am. Compl.
11 ¶ 69).

12        Plaintiffs contend that prior to the February 1998
13 altercation, defendants adopted an "integrated yard policy,"
14 under which inmates of various ethnic and factional affiliations
15 were sent into the yard.  (Am. Compl. ¶ 95).  According to
16 plaintiffs, this environment was promoted despite prison
17 officials' knowledge of intercultural hostilities between inmates
18 and the likelihood of violent altercations when members of these
19 groups were released to the yard at the same time.

20        Defendants now move for summary judgment on various
21 grounds including qualified immunity.

22 II.  Discussion

23        The court must grant summary judgment to a moving party
24 "if the pleadings, depositions, answers to interrogatories, and
25 admissions on file, together with the affidavits, if any, show
26 that there is no genuine issue as to any material fact and that
27 the moving party is entitled to judgment as a matter of law."
28 Fed. R. Civ. P. 56(c).  The party adverse to a motion for summary

judgment may not simply deny generally the pleadings of the movant; the adverse party must designate "specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  Simply put, "a summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data."  Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989).  The non-moving party must show more than a mere "metaphysical doubt" as to the material facts.  Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 587 (1986).

### A.   Qualified Immunity

A public official is entitled to qualified immunity if the law governing the official's conduct was not clearly established, or if under clearly established law he could have reasonably believed that his conduct was lawful.  Jeffers v. Gomez, 267 F.3d 895, 910 (9th Cir. 2001).[3]  The defendant bears the burden of establishing qualified immunity.  Crawford-El v. Britton, 523 U.S. 574, 586-87 (1998).

The United States Supreme Court recently articulated the following test for determining qualified immunity.  As a threshold question, the court must ask: "Taken in the light most favorable to the party asserting the injury, do the facts alleged

---

[3]   Plaintiffs object to Exhibit A, attached to defendants' motion for summary judgment.  Defendants have designated both the portion of Harding's deposition transcript and the Jeffers v. Gomez opinion as Exhibit A.  The court ascertains that plaintiffs are objecting to the Jeffers opinion.  This opinion is clearly relevant as it sets forth applicable legal principles, and requires the court to evaluate the evidence presented here in light of these principles.  Plaintiffs objections lack merit and are thus overruled.

1  show the [official's] conduct violated a constitutional right?"
2  Saucier v. Katz, 121 S.Ct. 2151, 2156 (2001).  If the answer is
3  affirmative in that "a violation could be made out on a favorable
4  view of the parties' submissions, the next, sequential step is to
5  ask whether the right was clearly established."  Id. at 2156.
6  The Court emphasized that the "relevant, dispositive inquiry in
7  determining whether a right is clearly established is whether it
8  would be clear to a reasonable [official] that his conduct was
9  unlawful in the situation he confronted."  Id.  If the answer is
10  negative, the official is entitled to qualified immunity.

11        The Supreme Court has repeatedly "stressed the
12  importance of resolving immunity questions at the earliest
13  possible stage in litigation."  Hunter v. Bryant, 502 U.S. 224,
14  227 (1991), cited in Saucier, 121 S.Ct. at 2156.  Where a
15  defendant seeks qualified immunity, "a ruling on that issue
16  should be made early in the proceedings so that the costs and
17  expenses of trial are avoided where the defense is dispositive."
18  Id. at 2156-57.

19        B.   Supervisory Liability

20        A supervisory official is not liable for the actions of
21  subordinates on a respondeat superior theory under 42 U.S.C. §
22  1983.  Jeffers, 267 F.3d at 915 (citing Hansen v. Black, 885 F.2d
23  642, 645-46 (9th Cir. 1989)).  "A supervisor may be liable under
24  § 1983 only if there exists either (1) his or her personal
25  involvement in the constitutional deprivation, or (2) a
26  sufficient causal connection between the supervisor's wrongful
27  conduct and the constitutional violation."  Id. (internal
28  quotations omitted).  A causal connection is "an affirmative

6

1  link" between a constitutional deprivation and "the adoption of
2  any plan or policy by [a supervisor,] express or otherwise
3  showing [his or her] authorization or approval of such
4  misconduct."  Rizzo v. Goode, 423 U.S. 362, 371 (1976).  The
5  inquiry into causation "must be individualized" and focused on
6  the duties and responsibilities of the individual defendant whose
7  acts or omissions are alleged to have caused a violation.  Leer
8  v. Murphy, 844 F.2d 628, 633 (9th Cir. 1988).

9              C.  Section 1983 Claims Against Harding

10             Harding was not at HDSP on February 4, 1998 and thus
11  did not directly participate in the release of inmates, the
12  response to the altercation, or the rendition of medical aid.
13  (Defs.' SUF ¶ 1).  Therefore, plaintiffs' claims against him can
14  only be examined in the context of his policy-level activities.
15  Jeffers, 267 F.3d at 916.

16             Harding contends that in his position as Chief Deputy
17  Director of Support Services, he oversaw "a branch that worked
18  with institutions personnel to properly articulate policy and
19  copy and distribute the same."  (Defs.' SUF ¶ 7).  Harding
20  maintains, however, that "no policy was independently promulgated
21  or implemented" by that branch or by him.  (Id.).  Plaintiffs
22  dispute these contentions, alleging that Harding was an "ultimate
23  overseer" in articulating policies and procedures at HDSP and
24  other institutions, suggesting that he had the authority to
25  review and make policy changes.  (Pls.' Opp'n at 16).

26             Notwithstanding his role in the CDC policymaking
27  process, Harding is entitled to qualified immunity for claims
28  arising out of his policy-related decisions unless the policies

                                   7

1  at issue are "so deficient" that the policies themselves are a
2  "repudiation of constitutional rights" and "the moving force of
3  the constitutional violation."   Jeffers, 267 F.3d at 914 (citing
4  Redman v. County of San Diego, 942 F.2d 1435, 1446 (9th Cir.
5  1991)) (internal quotations omitted).

6              1.  Use of Force Policy

7              Plaintiffs allege that Harding adopted and implemented
8  policies regarding the use of lethal force against inmates which
9  led to the shooting death of Torres, in violation of his Eighth
10 and Fourteenth Amendment rights.   The use of force policy in
11 effect at the time of the incident provided that:

12         firearms shall only be used when reasonably necessary
           to prevent or stop escapes, the taking of hostages, or
13         other circumstances which present an immediate danger
           of escape, loss of life, great bodily injury, or damage
14         to a substantial amount of valuable property.

15 (Pls.' Opp'n at 23-24).   The policy further provided that
16 firearms "shall be used only as a last resort after other
17 reasonable and available resources have been considered and
18 exhausted or are determined to be clearly inappropriate in view
19 of the immediate need to use armed force."  (Id.).   The policy
20 also provided that firearms were not to be used to stop "fist
21 fights" between inmates when there is no danger of death or great
22 bodily harm.   (Id.)

23             Even if the court draws all inferences in favor of
24 plaintiffs and assumes that Harding had significant control over
25 the promulgation and modification of this policy, Harding cannot
26 be held liable because the policy at issue was constitutionally
27 valid.   The identical use of force policy was considered by the
28 Ninth Circuit in Jeffers v. Gomez, 267 F.3d at 915.   In Jeffers,

                               8

1 the court found that this policy was constitutionally valid and
2 held that the CDC Director was entitled to qualified immunity on
3 claims related to the use of force policy.  Id. at 914, 918.
4 Thus, under Jeffers the same policy at issue here is not so
5 deficient that it is "itself a repudiation of constitutional
6 rights."  Id. at 914.

7          Plaintiffs suggest that Harding exhibited deliberate
8 indifference to the constitutional rights of Torres by
9 authorizing policies and practices that were different from the
10 use of force policy as written.  They argue that the policy as
11 implemented condoned the use of force on inmates in less than
12 life threatening situations. (Pls.' Opp'n at 16-17).

13          To establish a prison official's deliberate
14 indifference in violation of the Eighth Amendment, plaintiffs
15 must show that the official "knows of and disregards an excessive
16 risk to inmate health or safety."  Farmer v. Brennan, 511 U.S.
17 825, 837 (1994).  "[T]he official must both be aware of facts
18 from which the inference could be drawn that a substantial risk
19 of serious harm exists, and he must also draw the inference."  Id.
20 Unless there exists a "a sufficient causal connection" between
21 defendants' conduct and the alleged constitutional violation,
22 defendants cannot be liable under § 1983.  Jeffers, 267 F.3d at
23 915; Leer, 844 F.2d at 634 (holding that in order to recover
24 damages under § 1983 for an Eighth Amendment violation, plaintiff
25 must show that prison official was deliberately indifferent and
26 that this indifference was the actual and proximate cause of the
27 violation).

28          Plaintiffs present no evidence to support their

9

1 allegations that in overseeing the articulation of CDC policies,
2 Harding was deliberately indifferent in that he knew of and
3 disregarded a substantial risk to inmate safety.  Plaintiffs have
4 failed to raise a triable issue of fact that there was a causal
5 connection between Harding's policy-level conduct and the alleged
6 constitutional violation.

7        Because no constitutional right would have been
8 violated under the facts alleged by plaintiffs, there is "no
9 necessity for further inquiries concerning qualified immunity."
10 Saucier, 121 S.Ct. at 2156.  Thus, Harding is entitled to summary
11 judgment on all claims pertaining to CDC and HDSP use of force
12 policies.

13              2.   Integrated Yard Policy

14        Plaintiffs also allege that Harding and other
15 defendants enforced an unconstitutional integrated yard policy
16 that did not "provide for circumstances under which, the safety
17 of inmates must be taken into account, prior to forcing the
18 inmates to [be] integrated in the same yard." (Pls.' Opp'n at
19 41).  Defendants contend that the integrated yard policy at issue
20 here only applied to inmates in the administrative segregation
21 unit, not inmates in the general population yard where the
22 February 4, 1998 incident occurred.  (Defs.' SUF ¶ 8).

23        Unless a policy is "so deficient that the policy itself
24 is a repudiation of constitutional rights," an official who
25 promulgates the policy is entitled to qualified immunity.
26 Jeffers, 267 F.3d at 914.  Assuming Torres and other inmates were
27 subject to an integrated yard policy, the general policy of
28 integrating inmates of various ethnic groups is a policy of not

                            10

1   racially segregating inmates.   In <u>Cruz v. Bento</u>, 405 U.S. 319,
2   321 (1972), the Supreme Court suggested that a state-wide policy
3   of segregating prison yards may be unconstitutional.   <u>Id</u>.
4   (finding that "racial segregation, which is unconstitutional
5   outside prisons, is unconstitutional within prisons, save for the
6   necessities of prison security and discipline.").

7           Plaintiffs present no evidence that Harding "knew of
8   and disregard[ed] an excessive risk to inmate health or safety"
9   in relying on policies and procedures to ensure inmate safety.
10  <u>Farmer</u>, 511 U.S. at 837.   Plaintiffs do not show that Harding was
11  deliberately indifferent in articulating and distributing
12  policies concerning the integration of inmates, or that he
13  ratified policies or practices among custodial staff that
14  promoted integrated release in order to trigger violent
15  altercations among inmates.

16          Absent evidence of a causal link between Harding's
17  conduct and the alleged constitutional violations, Harding is
18  entitled to summary judgment on claims related to the integrated
19  yard policy.

20          3.   <u>Shooting Review Board</u>

21          Plaintiffs further allege that prison officials at HDSP
22  failed to conduct a proper investigation of the shooting
23  incident.   Defendant Harding did not participate in the
24  investigation, thus this claim can only be analyzed in the
25  context of his policymaking activities.

26          On its face, the Shooting Review policy is not "so
27  deficient that the policy itself is a repudiation of
28  constitutional rights."   <u>Jeffers</u>, 267 F.3d at 914.   Rather, it is

1  a neutral policy designed to monitor compliance with CDC
2  guidelines regarding the use of force by prison staff.
3  Plaintiffs present no evidence that Harding acted with deliberate
4  indifference in articulating, distributing, or relying on this
5  policy.  Plaintiffs allegations that the Shooting Review Board
6  ("SRB") conducted an inadequate investigation in this case does
7  not, absent specific evidence, raise an inference that Harding
8  promoted a custom or pattern of inadequate investigations, or
9  encouraged SRBs to exonerate staff members who violated the use
10  of force policy as a matter of course.

11      Thus, Harding is entitled to summary judgment on all
12  claims pertaining to the shooting review policy and SRB
13  investigation.

14      4.  Failure to Train

15      Plaintiffs allege that Harding failed to oversee the
16  proper training, supervision, and discipline of correctional
17  officers at HDSP, resulting in the inappropriate use of deadly
18  force against Torres.

19      Plaintiffs cite the deposition of correctional officer
20  Abney in support of their argument that training was inadequate.
21  Abney stated that the lethal force policy has changed since
22  February 4, 1998, in that now officers are taught to shoot to
23  "stop" rather than to shoot to "disable."  (Abney Dep. at 210).
24  He contended that there is no difference between the terms
25  "disable" and "stop," but that officers may have been confused as
26  to what "disable" meant before the policy language change.  (Id.
27  at 211).  Abney further testified that shooting to stop may now
28  include shooting at center mass if necessary.  (Id.).

1    Plaintiff's evidence is insufficient to raise a triable
2  issue that the alleged inadequacies in CDC's training program
3  constituted an Eighth Amendment violation by the defendants.   In
4  Jeffers, the Ninth Circuit determined that the [director of the
5  CDC could not be held liable for the allegedly unconstitutional
6  use of force by individual correctional officers under a failure-
7  to-train theory.   Jeffers, 267 F.3d at 915-16.   The plaintiff,
8  who was wounded by a rifle shot fired by an officer during a
9  prison riot, argued that CDC officer training was inadequate in
10  light of the Department's "shoot to disable" policy because
11  officers were trained to shoot at center mass rather than at arms
12  or legs.   Id.

13    The Ninth Circuit reasoned that "[n]one of these
14  circumstances, however, supports the conclusion that an
15  inadequacy in CDC's training program led to a deliberate
16  violation by [the Director] of [the plaintiff's] Eighth Amendment
17  rights."   Id. at 916.   The court concluded that even if the
18  allegations of inadequate training were taken as true, the
19  deficiencies were "insufficient to establish, even
20  circumstantially, that a substantial risk of serious harm to
21  inmates was known" to the Director.   Id. at 917.

22    Here, plaintiffs have not presented evidence that
23  defendant Harding conducted himself in a "reckless or malicious
24  manner, or that his actions were, in fact, deliberate."   Id. at
25  916.   The fact that Harding was responsible for the general
26  supervision and management of staff and the articulation and
27  distribution of CDC policies is not enough to raise an inference
28  that his conduct caused the alleged constitutional violation,

13

1  absent evidence that he was deliberately indifferent in the
2  promulgation of CDC training, supervision, and disciplinary
3  policies.

4          Harding is therefore entitled to summary judgment on
5  all claims pertaining to supervision, training, and discipline.

6          5.   Warden Susan Yearwood

7          Plaintiffs contend that Warden Susan Yearwood's alleged
8  shortcomings in overseeing HDSP led to the improper enforcement
9  of the CDC lethal force policy.  Plaintiffs present no evidence
10 that Harding, in his capacity as Chief Deputy Director for
11 Support Services, had any supervisory authority over Yearwood, or
12 was even aware of Yearwood's performance as warden of HDSP.
13 Merely alleging that HDSP was poorly managed at the time of the
14 incident is insufficient to establish a deliberate violation by
15 Harding of Torres' constitutional rights.

16         Thus, Harding is entitled to summary judgment on all
17 claims related to Yearwood.

18         6.   Emergency Medical Care

19         Plaintiffs' allege that prior to his death, Torres was
20 deprived of adequate emergency medical care in violation of his
21 Eighth Amendment rights.  (Pls.' Opp'n at 31-32).  The threshold
22 question under the Eighth Amendment is whether prison officials,
23 acting with deliberate indifference, exposed an inmate to a
24 sufficiently substantial risk of serious damage to his future
25 health.  Farmer, 511 U.S. at 843.  To establish deliberate
26 indifference, plaintiffs must show that defendants knew of and
27 disregarded an excessive risk to the decedent's health.  Farmer,
28 511 U.S. at 837.

14

1    Plaintiffs' evidence is insufficient, as a matter of
2  law, to establish that Harding acted with deliberate indifference
3  in the context of his policy-level activities related to inmate
4  medical care, or that he even promulgated or authorized policies
5  and practices related to medical care.

6    Harding is therefore entitled to summary judgment on
7  this issue.

8      D.   Section 1983 Claims Against Kelley, Marshall, and Stone
9          1.  Yard Release
10             a.  Eighth Amendment Claim

11    Defendants argue that Stone designed and implemented a
12  "slow systematic modified release" of the "Southern Hispanics"
13  and "Others" inmates into the exercise yard with conscious regard
14  for their safety.  (Defs.' Mot. at 11).  In November 1997, Stone
15  placed inmates from both groups on lockdown status following an
16  incident in which members of the "Southern Hispanics" attacked
17  "Others" inmates.  Defendants contend that these groups were
18  placed on lockdown "to ensure their mutual safety."  (Id.).  On
19  January 7, 1998 the "Others" were released to a modified yard
20  program, apparently because they were not the aggressors in the
21  November incident.[4]  (Id.).

22    Stone contends that he ordered Sergeant Boitano to
23  document and supervise meetings among inmates from the two groups
24  in order facilitate settlement of their differences so that they

25

26    [4]    The HDSP memorandum written by Sergeant Boitano to
   Captain Stone, summarizing events leading up to the February 4,
27  1998 incident, indicates that "Others" on Yard #1 were released
   on a modified program on December 24, 1997, while "Others" on
28  Yard #2 were released on a modified program on January 7, 1998.

15

1 could eventually program together without the possibility of
2 violent outbreaks.  (Defs.' Mot. at 11-12).  Defendants allege
3 that it was the "Southern Hispanics" who initiated this dialogue
4 when one of their influential members contacted Boitano to
5 discuss ending the hostilities among the inmate groups.
6 According to defendants, a series of meetings involving
7 influential members of both groups were held over a two-week
8 period.  (Defs.' SUF ¶¶ 20-23).  Defendants submit "signed
9 minutes" from these meetings in which inmates expressed that
10 there "would not be problems" among the groups, that "what
11 happened in the past was over," that their "word was good," and
12 that they were interested in programming together. (Defs.' Mot.
13 Ex. I, J, K).

14        Stone maintains that despite these assurances, he
15 nevertheless decided to release only ten inmates from each group
16 into the yard on February 4, 1998, rather than all inmates from
17 these groups.  (Defs.' Mot. at 12).  Kelley and Marshall contend
18 that they first learned of the plan to release these inmates on
19 the morning of February 4, 1998 in a meeting with Stone and other
20 staff members.  (Defs.' Mot. at 13).  In addition, defendants
21 state that the inmates were released in alternating groups of
22 two, starting with the representatives of the groups, and staff
23 members monitored them to evaluate their behavior.

24        Plaintiffs argue that the defendants had knowledge that
25 the "Southern Hispanics" and "Others" groups had a history of
26 violence.  This history includes the incident in August 1996, in
27 which two inmates from the "Others" group assaulted a "Southern
28 Hispanics" inmate and the November 1997 incident that led to the

16

1  lockdown.  (Pls.' Opp'n at 66-67).  Plaintiffs contend that there
2  was "no reasonable basis [for the defendants] to rely upon the
3  inmates' agreement that they would not engage in a fight."
4  (Pls.' Opp'n at 67).  They cite David Tristan's deposition
5  testimony, in which he stated:

6      There's times in which I personally was involved in
       unlocking a prison after a major riot.  I was given
7      assurances by everyone involved that everything was
       settled, that the differences had been settled.  We let
8      out the inmates, and within a few minutes there's a big
       riot and the subsequent riot is worse than the first
9      one and we have to lock down the institution again, and
       then we start all over again, but we cannot be as a
10     prison system on perpetual lockdown.  We have to try to
       get the inmates to program successfully as best we can.
11
12 (Tristan Dep. at 38).  This testimony suggests that prison
13 lockdown and release procedures, designed to balance often
14 conflicting penological interests, are fraught with
15 unpredictability.  However, this testimony does not raise an
16 inference that a retaliation on February 4, 1998 was inevitable,
17 or that defendants "knew of and disregard[ed] an excessive risk
18 to inmate health or safety" in designing and implementing the
19 yard release.  Farmer, 511 U.S. at 837.

20      The kind of evidence that courts have suggested would
21 give rise to an inference of deliberate indifference is entirely
22 lacking here.  In Robinson v. Prunty, 249 F.3d 862 (9th Cir.
23 2001), the Ninth Circuit affirmed a district court's denial of
24 qualified immunity to correctional officers where there was a
25 genuine issue of fact whether the officers were deliberately
26 indifferent to a substantial risk that an inmate would be
27 seriously harmed if he was placed in a racially integrated yard.
28 In Prunty, an African-American inmate alleged that when he was

17

1 released into the exercise yard on one occasion, he was attacked
2 by a Mexican-American inmate and the correctional officers on
3 duty watched the fight for about five minutes without attempting
4 to stop it.  Id. at 864.  On another occasion, before another
5 Mexican-American inmate was released into the yard with the
6 plaintiff, one guard joked about a potential fight among the
7 inmates, and another asked if tear gas would bother his asthma
8 while other guards laughed.  Id. at 864-65.

9      The Ninth Circuit found that the plaintiff's evidence
10 "paint[ed] a gladiator-like scenario, in which prison guards are
11 aware that placing inmates of different races in the yard at the
12 same time presents a serious risk of violent outbreaks."  Id. at
13 867.  The court further noted that:

> The defendants awareness of and indifference to this
> risk is demonstrated by the alleged frequency with
> which such outbreaks occur, by the alleged jokes made
> by the guards to [the plaintiff] before they released a
> Mexican-American inmate into the yard with him, and by
> the alleged fact that the guards failed to intervene
> while [plaintiff] was attacked by another inmate.

18 Id.

19      Unlike the circumstances giving rise to the Prunty
20 case, plaintiffs' evidence is devoid of any facts suggesting that
21 defendants predicted or encouraged violent altercations among
22 inmates.

23            b.   Qualified Immunity Defense

24      Assuming that a reasonable jury could find a
25 constitutional violation under the facts alleged by plaintiffs,
26 defendants Kelley, Marshall, and Stone are entitled to qualified
27 immunity for their conduct pertaining to the yard release.
28 In proceeding to the second question under Saucier, the court

18

1  must decide whether defendants could reasonably have believed
2  that their conduct was lawful in the situation they confronted.
3  Saucier, 121 S.Ct. at 2159 ("The question is what the officer
4  reasonably understood his powers and responsibilities to be, when
5  he acted, under clearly established standards."). The Supreme
6  Court emphasized in Saucier that the "concern of the immunity
7  inquiry is to acknowledge that reasonable mistakes can be made as
8  to the legal constraints" on the conduct of state officials. Id.
9  at 2158.

10         The evidence demonstrates that Stone was conscious of
11  inmate safety when he coordinated the yard release. In his
12  deposition, plaintiffs' counsel asked Stone if it would have been
13  easier to manage ten inmates from the "Southern Hispanics" and
14  "Others" groups (five inmates per group), or twenty inmates (ten
15  inmates per group). (Pls.' Opp'n at 19). Stone stated that a
16  total of ten would have been easier to control. However, this
17  testimony does not, as plaintiffs suggest, compel the conclusion
18  that a reasonable official in Stone's position would have
19  believed that the release of twenty inmates from both groups
20  created a substantial risk to inmate safety. According to Stone,
21  he placed the inmates on lockdown to promote their safety
22  following a previous altercation. He was aware that the inmates
23  notified staff members regarding settling differences and
24  programming together. He also ordered the release of the same
25  number of inmates from each group, presumably so that members
26  from neither group would feel outnumbered.

27         Marshall and Kelley also acted reasonably with respect
28  to the yard release and subsequent altercation. The evidence

demonstrates that in supervising the release, Marshall and Kelley monitored the inmates and responded to unusual inmate behavior. For example, they allowed some time to pass before each pair of inmates was released, and ordered staff to break up a group of ten "Others" who were walking close together.

The Supreme Court has cautioned that

> Prison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.  That deference extends to a prison security measure taken in response to an actual confrontation with riotous inmates, just as it does to prophylactic or preventive measures intended to reduce the incidence of these or any other breaches of prison discipline.  It does not insulate from review actions taken in bad faith and for no legitimate purpose, but it requires that neither judge nor jury freely substitute their judgment for that of officials who have made a considered choice.

Whitley v. Albers, 475 U.S. 312, 321-22 (1986) (citing Bell v. Wolfish, 441 U.S. 520, 547 (1979)) (internal quotations omitted).

The court concludes that defendants acted reasonably under the circumstances in implementing the yard release. Kelley, Marshall, and Stone are therefore entitled to summary judgment on the basis of qualified immunity on all claims related to the release.

### 2. Liability of Defendants With Respect to the Use of Force

Plaintiffs present no evidence that Kelley, Marshall or Stone used lethal or non-lethal force on Torres.  Plaintiffs' only viable Eighth Amendment claim against these defendants with respect to the use of force is that they "could have intervened before the use of excessive force, but failed and refused to do so ..." (Am. Compl. ¶ 71).

1        In <u>Jeffers</u>, the plaintiff alleged that two correctional
2   officers violated his Eighth Amendment rights during a prison
3   disturbance by failing to prevent each other from firing at him
4   in a malicious manner.   267 F.3d at 912.   The Ninth Circuit found
5   that one officers' failure to prevent the other from firing did
6   not create an inference of impermissible motive where each
7   officer focused on quelling the disturbance rather on the action
8   of his or her colleague.   <u>Id.</u>   The court found that there was no
9   evidence that each officer was aware that the other was acting in
10  a manner that violated the plaintiff's constitutional rights, or
11  that each had the opportunity to prevent the other's conduct.
12  <u>Id.</u>

13       Plaintiffs present no evidence showing that Kelley,
14  Marshall, or Stone knew that Runyon, who was in the observation
15  tower, was about to fire for effect.   Plaintiffs argue that in
16  two previous incidents involving inmate altercations, Runyon had
17  used a non-lethal 37 millimeter block gun to quell a disturbance.
18  (Pls.' Opp'n at 11-13).   Assuming that defendants knew of
19  Runyon's use of force in prior incidents, plaintiffs do not
20  present a triable issue of fact that defendants knew that Runyon
21  would utilize lethal force on February 4, 1998 and that they were
22  capable of preventing it but failed to do so.

23       The facts demonstrate that officers in the yard reacted
24  in various ways, including yelling "get down" and spraying the
25  inmates with pepper spray.[5]   Plaintiffs refer to a portion of

26

27      [5]    Plaintiffs submit statements written by inmates who
    were witnesses to the incident, contending that no verbal
28  warnings were given.   (Pls.' Opp'n Ex. 22, 60).   One inmate

1 Kelley's deposition, contending that he "appeared to be enjoying

2 the fight." (Pls.' Opp'n at 21). The portion reads as follows:

3         Q: After the attack, after they made contact, the
          Others with the Southerners, what happened after that?
4         A: There was a pretty good fight going on.
          Q: And who was fighting at that point?
5         A: Others and Southerners.
          Q: And how were they fighting?
6         A: With fists and feet.
          Q: Anything else?
7         A: I was about 100 feet away. I couldn't see nothing
          else.
8         Q: At the time that they made contact, what did you do?
          A: I started running that way, yelling "Get down."
9
   (Kelley Dep. at 133). Considering Kelley's statement that there
10
   "was a pretty good fight going on" in the light most favorable to
11
   plaintiffs, this evidence still does not raise an inference that
12
   Kelley acted with "impermissible motive" in failing to prevent
13
   the shooting. Jeffers, 267 F.3d at 912. Rather, the evidence
14
   demonstrates that he responded to and participated in quelling
15
   the disturbance.
16
         Because no constitutional right would have been
17
   violated under the facts alleged by plaintiffs, there is "no
18
   necessity for further inquiries concerning qualified immunity."
19
   Saucier, 121 S.Ct. at 2156. Defendants Kelley, Marshall, and
20
   Stone are therefore entitled to summary judgment on claims
21
   related to the use of excessive force and failure to prevent the
22
   use of excessive force.
23
   ///
24

25

26 stated that he only heard shots fired. (Ex. 60). However, two
   other inmates stated that they heard "yard down" or "get down,"
27 while a fourth described the shots that he heard. (Ex. 22, 60).
   Notwithstanding evidentiary objections to these statements, they
28 are insufficient to create a triable issue that the officers only
   responded by shooting.

3.   <u>Emergency Medical Care</u>

Plaintiffs allege that prior to his death, Torres was deprived of adequate emergency medical care in violation of his Eighth Amendment rights. (Pls.' Opp'n at 52-53). They argue that his gunshot injuries were survivable, and that failure to perform specific medical procedures contributed to his death. (<u>Id.</u>)

The threshold question under the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed an inmate to a sufficiently substantial risk of serious damage to his future health. <u>Farmer</u>, 511 U.S. at 843. To establish deliberate indifference, plaintiffs must show that defendants knew of and disregarded an excessive risk to the decedent's health. <u>Farmer</u>, 511 U.S. at 837.

The incident report notes that Medical Technical Assistants administered CPR to Torres and that Captain Stone applied pressure to his wound. (Pls.' Opp'n Ex. 14). Plaintiffs dispute that CPR was actually performed and allege that specific medical procedures, such as insertion of tubes to relieve the pressure in his chest cavity, were not performed in a timely manner. (Pls.' Opp'n at 53). However, plaintiffs present no evidence that Kelley, Marshall, or Stone acted with deliberate indifference by preventing the rendering of medical assistance. Plaintiffs also do not show that these defendants were trained to administer additional medical aid and deliberately failed to do so.

Kelley, Marshall, and Stone are therefore entitled to summary judgment on the issue of emergency medical care.

4.  Use of Force and Integrated Yard Policies; Failure
to Train; Shooting Review Board Investigation; Warden
Yearwood; and Emergency Medical Care

Several of the claims in the complaint are not relevant
to Kelley, Marshall, and Stone, as there is no evidence that they
had policymaking authority prior to and on February 4, 1998.

Thus, plaintiffs' claims pertaining to CDC and HDSP use
of force policies, the integrated yard policy, the Shooting
Review Board investigation, policies related to emergency medical
care, and Warden Yearwood's performance are dismissed against
these defendants.

With respect to plaintiffs' claims of inadequate
training, supervision, and discipline, plaintiffs present no
evidence raising a triable issue of a constitutional violation by
Kelley, Marshall, or Stone.  Defendants argue that they were not
responsible for developing or implementing training.  (Defs.' SUF
¶ 38).  According to defendants, a Training Advisory Committee
("TAC") is responsible for all training of all CDC staff.[6]
(Id.).

In regard to supervision and discipline, plaintiffs
have not presented evidence that these defendants conducted
themselves in a "reckless or malicious manner, or that [their]

---

[6]      With respect to his responsibilities for training,
Stone testified that if a staff member was overdue with respect
to a training requirement, Stone "would be the one that would
have to tell them to get the makeup."  (Stone Dep. at 134).
Absent specific evidence that Stone was aware of HDSP training
deficiencies and that any deficiencies created an excessive risk
to inmate safety, he cannot be held liable under controlling
Ninth Circuit authority.  Jeffers, 267 F.3d at 916 (reasoning
that CSP-Sac Warden had no "duty to change either his supervising
chain of command or statewide training requirements or materials"
absent concrete evidence of potential problems under the existing
policy regulating the use of force).

24

1   actions were, in fact, deliberate."   Jeffers, 267 F.3d at 916.
2   The fact that these defendants were responsible for the general
3   supervision and management of staff is not enough to raise an
4   inference that their conduct caused the alleged constitutional
5   violations.[7]

6          Kelley, Marshall, and Stone are therefore entitled to
7   summary judgment on all claims pertaining to training,
8   supervision, and discipline.

9       E.   Fourteenth Amendment Claims

10          1.   Torres' Placement on Lockdown

11          Plaintiffs allege that Torres' due process rights were
12   violated when he was placed on lockdown status between November
13   24, 1997 and February 4, 1998 without notice or a hearing.
14   Defendants indicate that Stone made the decision to place the
15   inmates on lockdown.   (Defs.' Mot. at 11).

16          The Supreme Court has emphasized that "[p]rison
17   administrators ... should be accorded wide-ranging deference in
18   the adoption and execution of policies and practices that in
19   their judgment are needed to preserve internal order and
20   discipline and to maintain institutional security."   Whitley, 475
21   U.S. at 321-22.   The Due Process Clause is not violated where an

22

23          [7]    Plaintiffs allege that Stone's secretary determined who
     would write performance evaluations for correctional officers.
24   (Pls.' Opp. SUF ¶ 21).   They cite Abney's deposition in support
     of this contention.   (Abney Dep. at 22-23).   Abney testified that
25   when there were multiple sergeants on the yard, Stone's secretary
     would decide to which sergeant evaluations would be referred.
26   (Id.).   Assuming that this allegation is true, it is insufficient
     to establish a triable issue of a causal connection between
27   Stone's conduct as Facility Captain and any alleged
     constitutional violation.   Jeffers, 267 F.3d at 915 (citing
28   Hansen v. Black, 885 F.2d 642, 645-46 (9th Cir. 1989)).

                                   25

1  inmate is transferred "to less amenable and more restrictive
2  quarters for nonpunitive reasons" as these restrictions are "well
3  within the terms of confinement ordinarily contemplated by a
4  prison sentence." Hewitt v. Helms, 459 U.S. 460, 468 (1983).

5        Plaintiffs have not shown that Torres was restrained in
6  a manner that "impose[d] atypical and significant hardship ... in
7  relation to the ordinary incidents of prison life." Sandlin v.
8  Conner, 515 U.S. 472, 484 (1995).  Plaintiffs' evidence is
9  insufficient to establish a genuine issue of a Fourteenth
10 Amendment violation arising out of Torres' placement on lockdown.

11             2.  Plaintiffs' Substantive Due Process Claim

12       Plaintiffs claim that they were denied their Fourteenth
13 Amendment right to a familial relationship with Torres.  (Am.
14 Compl. ¶¶ 94, 95).  Parents and children of a person killed by
15 state officials may assert a due process claim based on loss of
16 companionship.  Moreland v. Las Vegas Metropolitan Police, 159
17 F.3d 365, 371 (9th Cir. 1998) (reasoning that Fourteenth
18 Amendment claim brought by survivors was "based on the related
19 deprivation of their liberty interest arising out of their
20 relationship with [the decedent]") (citing Curnow v. Ridgecrest
21 Police, 952 F.2d 321, 325 (9th Cir. 1991)).  Plaintiffs'
22 Fourteenth Amendment rights to the companionship of Torres,
23 however, derive from the decedent's constitutional rights.
24 Johnson v. City of Oakland, No. C-97-283, 1997 WL 776368, at *4
25 (N.D. Cal. Dec. 3, 1997) (citing Smith v. Fontana, 818 F.2d 1411,
26 1420 (9th Cir. 1987)); see also Rhyne v. Henderson, 973 F.2d 386,
27 391 (5th Cir. 1992) (finding that mother's liberty interest
28 failed where evidence failed to establish underlying

1  constitutional violation of decedent's rights).  Because the
2  court finds that the defendants did not violate Torres'
3  constitutional rights, plaintiffs' Fourteenth Amendment claim
4  also fails.

5        3.  Equal Protection Claim

6        Plaintiffs allege that Torres was also denied his right
7  to equal protection under the Fourteenth Amendment.  (Am. Compl.
8  ¶ 68).  This claim fails because plaintiffs present no evidence
9  raising a triable issue of fact that Torres was treated
10 differently from similarly situated persons with respect to the
11 lockdown, yard release, use of force, or medical care.  See City
12 of Cleburne v. Cleburne Living Center, 473 U.S. 432, 439 (1985).

13     F.  Section 1985 Claim

14        Plaintiffs allege that the defendants conspired to
15 release rival gang members into the yard knowing that they would
16 fight with one another.  (Am. Compl. ¶ 75).  Plaintiffs contend
17 that the defendants manipulated facts to justify Torres' death,
18 fabricated investigation and autopsy reports, and destroyed
19 evidence demonstrating that Torres was an innocent victim.  (Am.
20 Compl. ¶¶ 76, 77, 81).  They also allege that defendants
21 conspired to enforce the integrated yard policy knowing that it
22 would result in violence, and an unwritten lethal force policy
23 which encouraged officers to shoot inmates for unlawful reasons.
24 (Am. Compl. ¶¶ 82-84).  These allegations are not supported by
25 the evidence.

26        To state a claim under 42 U.S.C. § 1985 for conspiracy
27 to interfere with civil rights, plaintiffs must include an
28 allegation of racial or class-based animus.  Usher v. City of Los

27

1  Angeles, 828 F.2d 556, 561 (9th Cir. 1987) ("To establish racial
2  or class-based animus, a plaintiff must show 'invidiously
3  discriminatory motivation ... behind the conspirators'
4  action.'") (citing Griffin v. Breckenridge, 403 U.S. 88, 102
5  (1971)).  Furthermore, allegations under § 1985 must be supported
6  by specific facts.  Karim-Panahi v. Los Angeles Police Dept., 839
7  F.2d 621, 626 (9th Cir. 1988) ("A claim under this section must
8  allege facts to support the allegation that defendants conspired
9  together.  A mere allegation of conspiracy without factual
10  specificity is insufficient.").

11       Plaintiffs contend that the "Southern Hispanics," of
12  which Torres was a member, is a protected class for the purpose
13  of § 1985.  However, plaintiffs have produced no evidence
14  suggesting the existence of racial or class-based animus on the
15  part of defendants underlying a conspiracy to deprive the
16  decedent of his civil rights.  Furthermore, plaintiffs present no
17  facts suggesting that defendants acted jointly to deprive Torres
18  of his constitutional rights.  Plaintiffs' allegations are
19  insufficient, as a matter of law, to establish a § 1985
20  violation.[8]

21       G.  Claims Against Defendants in their Official Capacity
22            Plaintiffs have sued Kelley, Marshall, and Stone for

23
24       [8]    To the extent plaintiffs' request to add complaint
allegations in support of the § 1985 claim can be construed as a
25  motion for leave to amend their complaint, this motion is DENIED.
Allowing plaintiffs to amend the complaint at this stage in the
26  litigation, after summary judgment motions have been filed, would
be inappropriate under either the standard of Fed. R. Civ. P.
27  16(b) or the more liberal standard of Fed. R. Civ. P. 15.  More
importantly, the evidence presented in opposition to defendants'
28  motion is insufficient, regardless of the allegations of the
complaint, to overcome defendants' motion.

1  damages in their individual and official capacities.  The
2  Eleventh Amendment bars a suit for damages against a state
3  official who is sued in his official capacity in federal court.
4  Kentucky v. Graham, 473 U.S. 159, 169 (1985); Dittman v.
5  California, 191 F.3d 1020, 1026 (9th Cir. 1999).  Plaintiffs'
6  claims against these defendants in their official capacity are
7  dismissed.

8       H.   State Law Claims

9            Under 28 U.S.C. § 1367(c)(3), the court has discretion
10  to dismiss state law claims when it has dismissed all of
11  plaintiff's federal claims.  "In the usual case in which federal
12  law claims are eliminated before trial, the balance of factors .
13  . . will point toward declining to exercise jurisdiction over the
14  remaining state law claims."  Carnegie-Mellon Univ. v. Cohill,
15  484 U.S. 343, 350 n. 7 (1988); Schneider v. TRW, Inc., 938 F.2d
16  986, 993 (9th Cir. 1991).  Some circuits have held that a court
17  may retain jurisdiction over state law claims if extraordinary or
18  unusual circumstances justify their retention.  See, e.g., Musson
19  Theatrical, Inc. v. Federal Express Corp., 89 F.3d 1244, 1255
20  (6th Cir. 1996); Wentzka v. Gellman, 991 F.2d 423, 425 (7th Cir.
21  1993).  However, here there has been no showing of extraordinary
22  or unusual circumstances.  Accordingly, the court declines to
23  exercise supplemental jurisdiction under 28 U.S.C. § 1367(c) as
24  to the remaining state law claims.

25       I.   Evidentiary Objections

26            Defendants have offered numerous evidentiary objections
27  to declarations submitted by plaintiffs in support of their
28  opposition.  Although these objections have merit, the court does

1  not need to consider the objections in light of its conclusion

2  that plaintiffs' evidence does not create a triable issue of

3  material fact sufficient to defeat defendants' motion for summary

4  judgment.[9]

5        IT IS THEREFORE ORDERED that defendants' motion for

6  summary judgment with respect to the federal causes of action

7  against defendants Harding, Kelley, Marshall, and Stone be, and

8  the same hereby is, GRANTED.  The remaining state claims are

9  DISMISSED pursuant to 28 U.S.C. § 1367(c).

10  DATED: January 9, 2002

11                          _William v. Shubb_
                            WILLIAM B. SHUBB
12                          UNITED STATES DISTRICT JUDGE

13

14

15

16

17

18

19

20

21

22      [9]   Plaintiffs complain generally about "spoilation of
    evidence" and discovery abuses by the defendants.  Plaintiffs'
23  motion to compel evidence including bullet fragments and casings
    from the February 4, 1998 shooting was considered and denied by
24  this court on October 3, 2001.  Furthermore, plaintiffs have had
    ample opportunity to file, and have filed, numerous discovery-
25  related motions before this court and the magistrate judge.
    Finally, this court has bent over backwards to address
26  plaintiffs' concerns and ensure fairness in the discovery
    process, for example by taking discovery away from the magistrate
27  judge and personally presiding over the parties' depositions.

28

United States District Court
for the
Eastern District of California
January 9, 2002


* * CERTIFICATE OF SERVICE * *


2:98-cv-02211


Estate Torres

       v.

Terhune

_____

I, the undersigned, hereby certify that I am an employee in the Office of
the Clerk, U.S. District Court, Eastern District of California.

That on  January 9, 2002, I SERVED a true and correct copy(ies) of
the attached, by placing said copy(ies) in a postage paid envelope
addressed to the person(s) hereinafter listed, by depositing said
envelope in the U.S. Mail, by placing said copy(ies) into an inter-office
delivery receptacle located in the Clerk's office, or, pursuant to prior
authorization by counsel, via facsimile.


        Roger E Naghash                      SH/WBS
        Law Offices of Roger E Naghash
        One Newport Place
        1301 Dove Street
        Suite 1000
        Newport Beach, CA  92660-2478

        Michael J Williams
        Attorney General's Office of the State of California
        PO Box 944255
        1300 I Street
        Suite 125
        Sacramento, CA  94244-2550

        Gregory Scott Walston
        Attorney General's Office of the State of California
        455 Golden Gate Avenue
        Suite 11000
        San Francisco, CA  94102-3664

        Jesse Manuel Rivera
        Moreno and Rivera
        1451 River Park Drive
        Suite 205
        Sacramento, CA  95815

Van Longyear
Longyear O'Dea and Lavra
3620 American River Drive
Suite 230
Sacramento, CA  95864-5923

Bruce Alan Kilday
Angelo Kilday and Kilduff
601 University Avenue
Suite 150
Sacramento, CA  95825

John Andrews Mason
Adams and Mason
PO Box 19937
730 Alhambra Boulevard
Suite 202
Sacramento, CA  95816


                                    Jack L. Wagner, Clerk

                               BY: _____
                                   Deputy Clerk