1

**FILED**

2

3   JAN - 9 2002

4   CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
5   BY _____
DEPUTY CLERK
6

7

8              UNITED STATES DISTRICT COURT

9              EASTERN DISTRICT OF CALIFORNIA

10                    ----oo0oo----

11   ESTATE OF SOLOMON ELI TORRES,
et al.,
12                                  NO. CIV. S-98-2211 WBS/GGH
             Plaintiffs,
13
     v.                            MEMORANDUM AND ORDER
14
                                   RE: Susan Yearwood;
15                                 Motion for Summary Judgment

16   CAL A. TERHUNE, et al.,

17           Defendants.

18                    ----oo0oo----

19           Plaintiffs Estate of Solomon Torres, et al. sue

20   defendants Cal Terhune et al. for various federal constitutional

21   and state law claims.  Defendant Susan Yearwood, former Warden of

22   High Desert State Prison, moves for summary judgment pursuant to

23   Federal Rule of Civil Procedure 56.

24   I.  Factual and Procedural Background

25           Plaintiffs allege that defendant prison officials shot

26   and killed Solomon Eli Torres aka David Solomon Torres

27   ("Torres"), an inmate at California's High Desert State Prison

28   ("HDSP"), during a prison-yard altercation between inmates

                            1

belonging to the "Southern Hispanics" and "Others" factions on February 4, 1998.

Plaintiffs allege that the altercation among the "Southern Hispanics" and "Others" in February 1998 was in retaliation for a prior incident in November 1997 in which two inmates from "Southern Hispanics" stabbed two inmates from "Others."[1]  (Pls.' Opp'n at 26 ).  As a result of the November 1997 incident, the two groups were placed on "lockdown" status, which limited their access to various prison programs and activities.  Torres was included among the "Southern Hispanics" who were placed on lockdown.

On February 4, 1998, prison officials initiated a release of inmates from both groups into the exercise yard. Eight "Southern Hispanics" and ten "Others" were released from their housing units into the yard in alternating groups of two. (Pls.' Opp'n at 31).  After ten "Others" inmates were released, they started walking around the track close together, and were ordered by the correctional officers to break up into smaller groups (Id.).  The "Others" complied with this order, but shortly thereafter began "grouping up" again.  Thereafter, the "Others" inmates ran toward and attacked the "Southern Hispanics".  (Id.)

The incident report and depositions suggest that various officers responded to the melee by yelling "get down." Some officers sprayed the fighting inmates with OC pepper spray. Correctional officer Runyon fired three warning shots and officer

---

[1]     The November 1997 incident apparently occurred in retaliation for an incident in August 1996, in which two inmates from the "Others" group assaulted a "Southern Hispanics" inmate. (Pls.' Opp'n at 27)

1  Viale fired one warning shot from their Mini-14 rifles. (Def.'s
2  Stmt. of Undisputed Facts, hereinafter "Def.'s SUF" ¶¶ 37-41).
3  Runyon also fired two shots for effect, and one of these bullets
4  struck Torres in the back. (Def.'s SUF ¶ 42).  Yearwood contends
5  that Torres was kicking another inmate in the head when he was
6  shot, and that Runyon fired the shot to protect this inmate.
7  (Id.).  Plaintiffs allege that Torres was struck by the bullet
8  "while he was on the ground being punched and stumped by other
9  inmate(s)."  (Pls.' Opp'n at 32).

10         Plaintiffs argue that the policies and practices
11 related to the use of lethal force at HDSP in 1998 were
12 unconstitutional.  (Am. Compl. ¶ 64).  They further allege that
13 defendants failed to properly train and supervise correctional
14 officers in the use of lethal force against inmates.  (Am. Compl.
15 ¶ 69).

16         Plaintiffs contend that prior to the February 1998
17 altercation, defendants adopted an "integrated yard policy,"
18 under which inmates of various ethnic and factional affiliations
19 were sent into the yard.  (Am. Compl. ¶ 95).  According to
20 plaintiffs, this environment was promoted despite prison
21 officials' knowledge of intercultural hostilities between inmates
22 and the likelihood of violent altercations when members of these
23 groups were released to the yard at the same time.

24         Defendant Yearwood now moves for summary judgment on
25 various grounds including qualified immunity.

26 II.  Discussion

27         The court must grant summary judgment to a moving party
28 "if the pleadings, depositions, answers to interrogatories, and

                                3

1  admissions on file, together with the affidavits, if any, show
2  that there is no genuine issue as to any material fact and that
3  the moving party is entitled to judgment as a matter of law."
4  Fed. R. Civ. P. 56(c).  The party adverse to a motion for summary
5  judgment may not simply deny generally the pleadings of the
6  movant; the adverse party must designate "specific facts showing
7  that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e);
8  Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  Simply put, "a
9  summary judgment motion cannot be defeated by relying solely on
10  conclusory allegations unsupported by factual data."  Taylor v.
11  List, 880 F.2d 1040, 1045 (9th Cir. 1989).  The non-moving party
12  must show more than a mere "metaphysical doubt" as to the
13  material facts.  Matsushita Elec. Indus. Co. v. Zenith Radio, 475
14  U.S. 574, 587 (1986).

15      A.   Qualified Immunity

16          A public official is entitled to qualified immunity if
17  the law governing the official's conduct was not clearly
18  established, or if under clearly established law he could have
19  reasonably believed that his conduct was lawful.  Jeffers v.
20  Gomez, 267 F.3d 895, 910 (9th Cir. 2001).  The defendant bears
21  the burden of establishing qualified immunity.  Crawford-El v.
22  Britton, 523 U.S. 574, 586-87 (1998).

23          The United States Supreme Court recently articulated
24  the following test for determining qualified immunity.  As a
25  threshold question, the court must ask: "Taken in the light most
26  favorable to the party asserting the injury, do the facts alleged
27  show the [official's] conduct violated a constitutional right?"
28  Saucier v. Katz, 121 S.Ct. 2151, 2156 (2001).  If the answer is

4

1  affirmative in that "a violation could be made out on a favorable
2  view of the parties' submissions, the next, sequential step is to
3  ask whether the right was clearly established."  Id. at 2156.
4  The Court emphasized that the "relevant, dispositive inquiry in
5  determining whether a right is clearly established is whether it
6  would be clear to a reasonable [official] that his conduct was
7  unlawful in the situation he confronted."  Id.  If the answer is
8  negative, the official is entitled to qualified immunity.

9       The Supreme Court has repeatedly "stressed the
10  importance of resolving immunity questions at the earliest
11  possible stage in litigation."  Hunter v. Bryant, 502 U.S. 224,
12  227 (1991), cited in Saucier, 121 S.Ct. at 2156.  Where a
13  defendant seeks qualified immunity, "a ruling on that issue
14  should be made early in the proceedings so that the costs and
15  expenses of trial are avoided where the defense is dispositive."
16  Id. at 2156-57.

17       B.   Supervisory Liability

18       A supervisory official is not liable for the actions of
19  subordinates on a respondeat superior theory under 42 U.S.C. §
20  1983.  Jeffers, 267 F.3d at 915 (citing Hansen v. Black, 885 F.2d
21  642, 645-46 (9th Cir. 1989)).  "A supervisor may be liable under
22  § 1983 only if there exists either (1) his or her personal
23  involvement in the constitutional deprivation, or (2) a
24  sufficient causal connection between the supervisor's wrongful
25  conduct and the constitutional violation."  Id. (internal
26  quotations omitted).  A causal connection is "an affirmative
27  link" between a constitutional deprivation and "the adoption of
28  any plan or policy by [a supervisor,] express or otherwise

                                5

1 showing [his or her] authorization or approval of such
2 misconduct." Rizzo v. Goode, 423 U.S. 362, 371 (1976). The
3 inquiry into causation "must be individualized" and focused on
4 the duties and responsibilities of the individual defendant whose
5 acts or omissions are alleged to have caused a violation. Leer
6 v. Murphy, 844 F.2d 628, 633 (9th Cir. 1988).

7 Yearwood served as HDSP Warden from July 1, 1997 to
8 June 30, 1998 (Def.'s SUF ¶ 2). As Warden, she was charged with
9 the overall operation of the prison, including implementing CDC
10 and HDSP policies. (Yearwood Dep. at 9, 167-69). At the time of
11 the February 4, 1998 altercation, Yearwood was at the prison but
12 was not present on the yard or in a location where she could view
13 activities occurring on the yard. (Def.'s SUF ¶ 43).
14 Plaintiffs' claims against her and her qualified immunity defense
15 will thus be analyzed in the context of her policy-level and
16 supervisory duties and activities.

17 C. Eighth Amendment Claims under Section 1983

18 1. CDC's Use of Force Policy

19 Plaintiffs allege that Yearwood exhibited deliberate
20 indifference to the constitutional rights of Torres by
21 authorizing unconstitutional policies and practices related to
22 the use of lethal force. To establish a prison official's
23 deliberate indifference in violation of the Eighth Amendment,
24 plaintiffs must show that the official "knows of and disregards
25 an excessive risk to inmate health or safety." Farmer v.
26 Brennan, 511 U.S. 825, 837 (1994). "[T]he official must both be
27 aware of facts from which the inference could be drawn that a
28 substantial risk of serious harm exists, and [s]he must also draw

6

1  the inference." Id.  Unless there exists a "a sufficient causal
2  connection" between defendants' conduct and the alleged
3  constitutional violation, defendants cannot be liable under §
4  1983.  Jeffers, 267 F.3d at 915; Leer, 844 F.2d at 634 (holding
5  that in order to recover damages under § 1983 for an Eighth
6  Amendment violation, plaintiff must show that prison official was
7  deliberately indifferent and that this indifference was the
8  actual and proximate cause of the violation).

9       The official use of force policy in effect at the time
10  of the incident provided that:

11       firearms shall only be used when reasonably necessary
         to prevent or stop escapes, the taking of hostages, or
12       other circumstances which present an immediate danger
         of escape, loss of life, great bodily injury, or damage
13       to a substantial amount of valuable property.

14  (Pls.' Opp'n at 20).  The policy further provided that firearms
15  "shall be used only as a last resort after other reasonable and
16  available resources have been considered and exhausted or are
17  determined to be clearly inappropriate in view of the immediate
18  need to use armed force." (Id.).  The policy also provided that
19  firearms were not to be used to stop "fist fights" between
20  inmates when there is no danger of death or great bodily harm.
21  (Id.).

22       The identical use of force policy was considered by the
23  Ninth Circuit in Jeffers v. Gomez, 267 F.3d at 915.  In Jeffers,
24  the court found that this policy was constitutionally valid and
25  held that the CDC Director was entitled to qualified immunity on
26  claims related to it.  Id. at 914, 918.  The appellate panel also
27  noted that the district court "made several errors" in its
28  analysis of the claims made against the CSP-Sac Warden,

1   specifically in failing to analyze "whether federal law clearly
2   established that the warden's reliance on CDC's Shooting Policy
3   violated [the plaintiff's] rights." Id. at 916.  The court
4   reasoned that "it was the warden's duty to implement this policy,
5   as there was no clearly established law prohibiting its use."
6   Id.

7          Here, Yearwood's reliance on and implementation of the
8   policy cannot constitute an Eighth Amendment violation where
9   Ninth Circuit authority squarely affirms such reliance as
10  constitutionally sound.  Yearwood is thus entitled to summary
11  judgment on claims related to the CDC and HDSP use of force
12  policy.

13          2.  Yearwood's Management of HDSP

14          Plaintiffs make general allegations that HDSP was "a
15  poorly managed and operated maximum security prison, that was
16  operated and managed by a mentally deficient warden." (Pls.'
17  Opp'n at 10).  In support of their allegations, plaintiffs cite
18  the testimony of defendant CDC officials, who stated that
19  Yearwood was under a lot of stress in her position as HDSP
20  warden, that she "managed by memos", and that she displayed
21  bizarre behaviors including playing with toy cars and "trinkets",
22  talking to herself while no one was around, and behaving
23  inappropriately at meetings. (Terhune Dep. at 47-48; Cambra Dep.
24  at 23-25).  Plaintiffs note that the California Senate Rules
25  Committee informed defendant Terhune that it would not recommend
26  Yearwood's confirmation as HDSP warden following a site visit.
27  (Pls.' Opp'n at 28).  Finally, plaintiffs contend that a shooting
28  of another inmate at HDSP occurred in December 1997, while

8

1  Yearwood was Warden, and that "following Ms. Yearwood's
2  departure, all shootings by the CDC staff, at HDSP, were ceased."
3  (Pls.' Opp'n at 10).

4        Plaintiffs' allegations and supporting evidence do not
5  create a triable issue of fact that in her position as Warden,
6  Yearwood acted with deliberate indifference in that she was aware
7  of an excessive risk to the safety of Torres and disregarded it.
8  Plaintiffs have not presented facts showing that Yearwood
9  exhibited the alleged unusual behaviors in the period of time
10 leading up to the February 4, 1998 incident.  On the contrary,
11 the evidence suggests that deposition testimony relating to this
12 behavior concerned a time period several months following Torres'
13 death.

14       Furthermore, even if a reasonable jury could draw the
15 inference that Yearwood displayed these behaviors throughout her
16 tenure as HDSP Warden, plaintiffs present no evidence that her
17 behavior was causally linked to the alleged violation, in that
18 she knew of and disregarded a substantial possibility that
19 Torres' safety would be compromised when she approved the yard
20 release.  <u>Farmer</u>, 511 U.S. at 837.  Finally, their allegation
21 that two shooting deaths occurred during her tenure at HDSP and
22 ceased thereafter is insufficient to raise a triable issue that
23 Yearwood "conducted [herself] in a reckless or malicious manner
24 or that [her] actions were, in fact, deliberate."  <u>Jeffers</u>, 267
25 F.3d at 916.  Without evidence of an "affirmative link" between
26 Yearwood's conduct and the alleged constitutional deprivations,
27
28

9

1 plaintiffs' claims cannot withstand summary judgment.[2]  Rizzo,
2 423 U.S. at 371.

3                3.  Yearwood's Knowledge of Runyon's Use of Force

4                Plaintiffs' evidence does not support their allegations
5 that Yearwood authorized or condoned staff deviation from CDC and
6 HDSP use of force policies.

7                Plaintiffs allege that, in responding to the February
8 4, 1998 incident, defendant Runyon did not follow the "Post
9 Orders" in place which set forth the duties of officers assigned
10 to the Facility D Observation Tower.  (Pls.' Opp'n at 21; Ex.
11 71).  They allege that he utilized the Mini 14 rifle, rather than
12 the 37 mm Launcher, to fire warning shots, did not allow other
13 reasonable and available resources to be exhausted before firing
14 the rifle, and did not dial the emergency number.  (Pls.' Opp'n
15 at 23-24).  After analyzing the appropriateness of Runyon's
16 attempt to quell the February 4, 1998 disturbance, plaintiffs
17 state that "Yearwood simply does recall many facts and
18 circumstances surrounding Torres' death."  They suggest that at
19 the time of the incident Yearwood essentially abdicated
20 responsibility for the operation of the prison while her

21

22              [2]    Plaintiffs allege that Yearwood's testimony that no one
23 influenced her decision to retire from the CDC is false, because
   other defendants including Terhune, Cambra, and Tristan testified
24 that they discussed her transfer from HDSP.  (Pls.' Opp'n at 38).
   Plaintiff cite these deposition portions in support of their
25 allegations that Yearwood attempts to conceal that she was
   terminated from HDSP because she was unqualified in her position
26 as Warden.  However, the testimony relating to her retirement
   from the CDC in January 2000 is unrelated to and not inconsistent
27 with testimony regarding her transfer from HDSP to the California
   Correctional Center at Susanville in July 1, 1998.  Plaintiffs'
28 evidence thus fails to establish a disputed issue of material
   fact that would defeat summary judgment.

                                  10

1  subordinates "were utilizing their mini 14 rifles and using
2  inmates for live target shooting and practice."[3]   (Pls.' Opp'n at
3  25).

4       Plaintiffs also discuss defendant Runyon's use of force
5  on two occasions prior to February 4, 1998.   Runyon testified
6  that he used a non-lethal 37 mm block gun to strike an inmate
7  during two inmate fights that occurred between 1995 and 1997.
8  (Pls.' Opp'n at 12-14).   Plaintiffs imply that Runyon's use of
9  non-lethal force on prior occasions creates an inference that
10 Yearwood was aware of this alleged pattern of "shooting sprees"
11 and the possibility that excessive force would be used on
12 February 4, 1998.   However, plaintiffs present no evidence that
13 Runyon's use of non-lethal force on the prior occasions was in
14 violation of CDC and HDSP policies.

15      Under applicable legal authority, Yearwood cannot be
16 held liable for the actions of subordinates on a vicarious
17 liability theory under § 1983.   Jeffers, 267 F.3d at 915.   Thus,
18 even if a reasonable jury could find that Runyon's actions on
19 February 4, 1998 constituted an Eighth Amendment violation, this
20 conclusion by itself is insufficient to establish Yearwood's
21 liability.   In order to create a triable issue, plaintiffs must
22 present evidence of a "sufficient causal connection" between her

23
24      [3]   Plaintiffs allege that Yearwood failed to cooperate
   with the Shooting Review Board ("SRB") investigation by
25 preventing the SRB from receiving various post orders.   (Pls.'
   Opp'n at 25).   They cite William Steven Rigg's declaration in
26 support of these allegations.   Because plaintiffs have withdrawn
   Rigg as their expert witness, the court does not consider his
27 declaration.   (Scholar Decl. II Ex. A).   Furthermore, plaintiffs
   present no evidence raising an inference of a causal link between
28 Yearwood's conduct and any potential constitutional deprivation
   related to the investigation.

11

1 allegedly wrongful conduct and the alleged constitutional
2 violations.

3        Plaintiffs' contention that Yearwood did not recall all
4 the details of the shooting during a deposition three years
5 following the incident is insufficient to establish that she
6 conducted herself in a deliberately indifferent manner during the
7 period of time leading up to the incident.  Furthermore, assuming
8 that Yearwood was aware that Runyon used non-lethal force during
9 two inmate fights prior to February 4, 1998, her knowledge of his
10 use of non-lethal force does not raise an inference that she was
11 aware that Runyon might use lethal force in violation of CDC and
12 HDSP use of force policies on a subsequent occasion.

13        Plaintiffs' evidence fails to raise a triable issue of
14 a constitutional violation perpetrated by Yearwood in this
15 context.  They do not present facts that would raise an inference
16 that she was aware of an excessive safety risk to Torres and
17 failed to take reasonable steps to abate it.

18        Thus, Yearwood is entitled to summary judgment on all
19 claims related to Runyon's use of force.

20        4.   Yard Release

21             a.   Eighth Amendment Claim

22        Plaintiffs allege that Yearwood participated in the
23 design and implementation of the yard release, knowing that there
24 would be a violent retaliation among inmates.

25        It appears that Yearwood participated in and monitored
26 staff meetings that were convened in order to facilitate the
27 eventual integrated programming of "Others" and "Southern
28 Hispanics" inmates who had been placed on lockdown.  (Def.'s Mot.

1   at 3).  She states that in an attempt to ensure that inmates
2   could get along in the yard, efforts were made to release small
3   groups of "Southern Hispanics" and "Others" for meals in the
4   dining hall and for limited activities in the day room.  (Id.).
5   Facility Captain Stone and other staff members also monitored
6   negotiations between inmates apparently geared toward ending the
7   hostilities between the rival groups.  (Id.).  According to
8   Yearwood, the efforts to integrate inmates and the negotiations
9   among influential members of both groups over a two week period
10  led her to believe that the groups had reconciled and it would be
11  safe to initiate a general yard release.  Yearwood contends that
12  various factors were considered prior to the release including
13  "inmate behavior, prior behavior, inmate cooperation with other
14  inmates and staff, inmate attitudes, [and] inmate desire to
15  resume programming." (Def.'s SUF ¶ 20).  Yearwood contends that
16  in preparation for the release, she directed that extra staff
17  members be on the yard "as a precautionary measure." (Def.'s SUF
18  ¶ 28)

19          Plaintiffs contend that "Yearwood knew that the
20  conflict between the 'Southern Hispanics' and 'Others' was deeply
21  rooted along their racial and ethnicity lines" and allege that
22  this knowledge raises an inference that she was aware of a strong
23  probability of violence when these inmates were released.  (Pls.'
24  Opp'n at 19).   They submit a letter written by inmate Ronald
25  Davis to plaintiffs' counsel in support of their allegations that
26  CDC knew in advance that "Others" inmates were going to fight
27  with the "Southern Hispanics." (Pls.' Opp'n at 50).  The letter
28  states:  "I due know that staff was suppose to have being fore

                                13

1  warned that it was going to go down that morning." (Pls.' Opp'n
2  Ex. 72).  This letter is without foundation and is insufficient
3  to create a triable issue of fact that Yearwood or other
4  defendants involved in the release were aware that a fight would
5  break out among inmates, including Torres, on February 4, 1998.
6  After drawing all inferences in favor of plaintiffs, the court
7  ascertains that the letter suggests, at best, that unidentified
8  staff members were supposed to be warned in advance by
9  unidentified persons that a fight would occur.  This letter does
10  not raise an inference that Yearwood was warned in advance that a
11  fight would occur and disregarded these warnings with deliberate
12  indifference to an excessive safety risk.[4]    Farmer, 511 U.S. at
13  837.

14       Plaintiffs also cite David Tristan's deposition
15  testimony in support of the allegation that Yearwood was aware
16  that a retaliation was bound to occur if rival inmates were
17  released to the general population yard.  Tristan testified:

18       There's times in which I personally was involved in
         unlocking a prison after a major riot.  I was given
19       assurances by everyone involved that everything was
         settled, that the differences had been settled.  We let
20       out the inmates, and within a few minutes there's a big
         riot and the subsequent riot is worse than the first
21       one and we have to lock down the institution again, and
         then we start all over again, but we cannot be as a
22       prison system on perpetual lockdown.  We have to try to
         get the inmates to program successfully as best we can.
23
         (Tristan Dep. at 38).  This testimony suggests that prison
24

25  _____
26       [4]    Yearwood objects to the admissibility of the letter on
    the ground that it constitutes hearsay and was not produced in
27  discovery.  Although this objection has merit, the court does not
    need to consider the objection in light of its finding that the
28  exhibit does not create a triable issue of material fact
    sufficient to defeat summary judgment.

                              14

1 lockdown and release procedures, designed to balance often
2 conflicting penological interests, are fraught with
3 unpredictability. However, this testimony does not raise an
4 inference that a retaliation on February 4, 1998 was inevitable,
5 or that Yearwood "knew of and disregard[ed] an excessive risk to
6 inmate health or safety" in designing and implementing the yard
7 release. Farmer, 511 U.S. at 837.

8         Plaintiffs further allege that, other than directing
9 that two extra staff members be present on the yard, Yearwood
10 failed to prepare a "contingency plan" that would be implemented
11 after the controlled release in the event a violent outbreak
12 among inmates occurred. (Pls.' Opp'n at 17). The Ninth Circuit
13 has emphasized that such claims must be viewed in light of the
14 deference that should be given to prison officials in the
15 determination of appropriate measures to ensure institutional
16 order and security. Jeffers, 267 F.3d at 917. Furthermore, the
17 court maintained that it would defer to prison officials "who
18 have experience derived from years of observation and practice,
19 as to the appropriateness of their emergency action plans." Id.

20         Because plaintiffs have not provided evidence that
21 Yearwood was subjectively aware of and disregarded an obvious
22 danger when she approved the yard release, she is entitled to
23 summary judgment on all claims related to the release.

24                 b.  Qualified Immunity Defense

25         Assuming that a reasonable jury could find a
26 constitutional violation under the facts alleged by plaintiffs,
27 Yearwood is entitled to qualified immunity for her conduct
28 pertaining to the yard release. In proceeding to the second

                                15

1  question under <u>Saucier</u>, the court must decide whether Yearwood
2  could reasonably have believed that her conduct was lawful in the
3  situation she confronted.  <u>Saucier</u>, 121 S.Ct. at 2159 ("The
4  question is what the [official] reasonably understood his powers
5  and responsibilities to be, when he acted, under clearly
6  established standards.").  The Supreme Court emphasized in
7  <u>Saucier</u> that the "concern of the immunity inquiry is to
8  acknowledge that reasonable mistakes can be made as to the legal
9  constraints" on the conduct of state officials.  <u>Id.</u> at 2158.

10      Considering the information available to Yearwood in
11 the situation she confronted, she reasonably relied on the
12 procedures developed by her subordinates to move the inmates from
13 lockdown to integrated programming.  After the lockdown was
14 instituted, prison officials reasonably anticipated the need to
15 eventually resume normal programming.  The facts indicate that
16 the integration of small groups of inmates in the dining hall and
17 day-room activities was successful and that inmates assured staff
18 members that hostilities among them had been alleviated after two
19 weeks of negotiations.  Furthermore, the controlled release plan
20 provided that alternating inmate pairs would be released and
21 monitored until a maximum of twenty inmates were on the yard, and
22 extra staff members were assigned to the yard as a precautionary
23 measure.  Under the facts alleged by plaintiffs, a reasonable
24 warden would have believed that the manner in which the inmates
25 were released incorporated safety concerns and alleviated the
26 risk of an altercation.  <u>Jeffers</u>, 267 F.3d at 917.  Because the
27 court concludes that a reasonable warden in Yearwood's position
28 would not have believed that her conduct was unlawful in the

16

1  situation that she confronted, she is entitled to qualified
2  immunity on all claims related to the yard release.

3                5.  Integrated Yard Policy

4          Plaintiffs allege that Yearwood and other defendants
5  implemented an "integrated yard policy with full knowledge that
6  it would result in inmates engaging in intercultural fighting and
7  violence." (Am. Compl. ¶ 95). Assuming Torres and other inmates
8  were subject to an integrated yard policy, the general policy of
9  integrating inmates of various ethnic groups is a policy of not
10  racially segregating inmates.  In Cruz v. Bento, 405 U.S. 319,
11  321 (1972), the Supreme Court suggested that a state-wide policy
12  of segregating prison yards may be unconstitutional.  Id.
13  (finding that "racial segregation, which is unconstitutional
14  outside prisons, is unconstitutional within prisons, save for the
15  necessities of prison security and discipline.").

16          With respect to their allegations specifically relating
17  to Yearwood's duties and conduct, plaintiffs present no evidence
18  raising a triable issue of fact that she implemented or ratified
19  policies or practices among custodial staff that promoted
20  integrated release for the purpose of triggering violent
21  altercations among inmates.  They also present no evidence that
22  she implemented an integrated yard policy knowing that it would
23  create a risk to Torres' safety.  Absent evidence of a causal
24  link between Yearwood's conduct and the alleged constitutional
25  violation, she is entitled to summary judgment on claims related
26  to the integrated yard policy.

27                6.  Failure to train

28          Plaintiffs allege that Yearwood's failure to "properly

                              17

1  supervise, manage, and recognize the shortcomings of the policies
2  and procedures and request additional training" with respect to
3  the use of lethal force resulted in the alleged violations of
4  Torres' constitutional rights.  (Pls.' Opp'n at 17-18).  They
5  cite the deposition of correctional officer Abney in support of
6  their argument.  Abney stated that the lethal force policy has
7  changed since February 4, 1998, in that now officers are taught
8  to shoot to "stop" rather than to shoot to "disable."  (Abney
9  Dep. at 210).  He contended that there is no difference between
10  the terms "disable" and "stop," but that officers may have been
11  confused as to what "disable" meant before the policy language
12  change.  (Id. at 211).  Abney further testified that shooting to
13  stop may now include shooting at center mass if necessary.
14  (Id.).

15         Plaintiff's evidence is insufficient to raise a genuine
16  issue that Yearwood was deliberately indifferent in the context
17  of her implementation and supervision of HDSP training.   In
18  Jeffers, the Ninth Circuit determined that the CDC Director and
19  CSP-Sac Warden could not be held liable for the allegedly
20  unconstitutional use of force by individual correctional officers
21  under a failure-to-train theory.  267 F.3d at 915-17.  The
22  plaintiff, who was wounded by a rifle shot fired by an officer
23  during a prison riot, argued that CDC officer training was
24  inadequate in light of the Department's "shoot to disable" policy
25  because officers were trained to shoot at center mass rather than
26  at arms or legs.  Id.

27         The Ninth Circuit reasoned that "[n]one of these
28  circumstances, however, supports the conclusion that an

18

1  inadequacy in CDC's training program led to a deliberate
2  violation" by the Director of the plaintiff's Eighth Amendment
3  rights.  Id. at 916.  The court concluded that even if the
4  allegations of inadequate training were taken as true, the
5  deficiencies were "insufficient to establish, even
6  circumstantially, that a substantial risk of serious harm to
7  inmates was known" to the Director or Warden.  Id. at 917.

8         Plaintiffs argue that defendant Runyon should not have
9  been assigned to a gun post under Yearwood's command because of
10 his prior use of force and allegedly inadequate training.  (Pls.'
11 Opp'n at 49).  However, this argument is not supported by the
12 evidence.  Defendants present evidence that Runyon received all
13 of his required training in the year preceding the February 4,
14 1998 incident.  (Def.'s Mot. at 13-14).  Even if a reasonable
15 jury could find that Runyon used excessive force in his attempt
16 to quell the disturbance, this finding alone is insufficient to
17 establish a causal link between Yearwood's conduct and the
18 alleged constitutional violation.  Absent specific evidence that
19 Yearwood was aware of HDSP training deficiencies and that any
20 deficiencies created an excessive risk to inmate safety, she
21 cannot be held liable under controlling Ninth Circuit authority.
22 Jeffers, 267 F.3d at 916 (reasoning that CSP-Sac Warden had no
23 "duty to change either his supervising chain of command or
24 statewide training requirements or materials" absent concrete
25 evidence of potential problems under the existing policy
26 regulating the use of force).

27        Yearwood is thus entitled to summary judgment on all
28 claims related to HDSP staff training, supervision, and

1 discipline.

2          7.   Emergency Medical Care

3          Plaintiffs allege that prior to his death, Torres was
4 deprived of adequate emergency medical care in violation of his
5 Eighth Amendment rights.  (Pls.' Opp'n at 34).  It does not
6 appear that Yearwood supervised the administration of medical
7 care at HDSP because medical services in CDC prisons are provided
8 through a separate chain of command outside the Warden's
9 authority. (Defs.' Mot. at 14).  The threshold question under the
10 Eighth Amendment is whether Yearwood, acting with deliberate
11 indifference, exposed Torres to a sufficiently substantial risk
12 of serious damage to his future health.  Farmer, 511 U.S. at 843.
13 To establish deliberate indifference, plaintiffs must show that
14 she knew of and disregarded an excessive risk to the decedent's
15 health.  Farmer, 511 U.S. at 837.

16          The evidence presented is insufficient, as a matter of
17 law, to establish that Yearwood acted with deliberate
18 indifference in the context of her supervisory or policymaking
19 activities related to inmate medical care, or that she even
20 promulgated or authorized policies and practices related to
21 medical care.

22          Thus, Yearwood is entitled to summary judgment on this
23 issue.

24     D.   Fourteenth Amendment Claims

25          1. Torres' Placement on Lockdown

26          Plaintiffs allege that Torres' due process rights were
27 violated when he was placed on lockdown status between November
28 24, 1997 and February 4, 1998 without notice or a hearing.

20

1  The Supreme Court has emphasized that "[p]rison
2  administrators ... should be accorded wide-ranging deference in
3  the adoption and execution of policies and practices that in
4  their judgment are needed to preserve internal order and
5  discipline and to maintain institutional security." Whitley, 475
6  U.S. at 321-22.  The Due Process Clause is not violated where an
7  inmate is transferred "to less amenable and more restrictive
8  quarters for nonpunitive reasons" as these restrictions are "well
9  within the terms of confinement ordinarily contemplated by a
10 prison sentence." Hewitt v. Helms, 459 U.S. 460, 468 (1983).

11  Plaintiffs have not shown that Torres was restrained in
12 a manner that "impose[d] atypical and significant hardship ... in
13 relation to the ordinary incidents of prison life." Sandlin v.
14 Conner, 515 U.S. 472, 484 (1995).  Plaintiffs' evidence is
15 insufficient to establish a genuine issue of a Fourteenth
16 Amendment violation arising out of Torres' placement on lockdown.

17         2. Plaintiffs' Substantive Due Process Claim

18  Plaintiffs claim that they were denied their Fourteenth
19 Amendment right to a familial relationship with Torres.  (Am.
20 Compl. ¶¶ 94, 95).  Parents and children of a person killed by
21 state officials may assert a due process claim based on loss of
22 companionship. Moreland v. Las Vegas Metropolitan Police, 159
23 F.3d 365, 371 (9th Cir. 1998) (reasoning that Fourteenth
24 Amendment claim brought by survivors was "based on the related
25 deprivation of their liberty interest arising out of their
26 relationship with [the decedent]") (citing Curnow v. Ridgecrest
27 Police, 952 F.2d 321, 325 (9th Cir. 1991)).  Plaintiffs'
28 Fourteenth Amendment rights to the companionship of Torres,

1 however, derive from the decedent's constitutional rights.

2 Johnson v. City of Oakland, No. C-97-283, 1997 WL 776368, at *4

3 (N.D. Cal. Dec. 3, 1997) (citing Smith v. Fontana, 818 F.2d 1411,

4 1420 (9th Cir. 1987)); see also Rhyne v. Henderson, 973 F.2d 386,

5 391 (5th Cir. 1992) (finding that mother's liberty interest

6 failed where evidence failed to establish underlying

7 constitutional violation of decedent's rights).  Because the

8 court finds that Yearwood did not violate Torres' constitutional

9 rights, plaintiffs' Fourteenth Amendment claim also fails.

10          3. Equal Protection Claim

11          Plaintiffs allege that Torres was also denied his right

12 to equal protection under the Fourteenth Amendment.  (Am. Compl.

13 ¶ 68).  This claim fails because plaintiffs present no evidence

14 raising a triable issue of fact that Torres was treated

15 differently from similarly situated persons with respect to the

16 lockdown, yard release, use of force, or medical care.  See City

17 of Cleburne v. Cleburne Living Center, 473 U.S. 432, 439 (1985).

18     F.   Section 1985 Claim

19          Plaintiffs allege that Yearwood and other defendants

20 conspired to release rival gang members into the yard knowing

21 that they would fight with one another.  (Am. Compl. ¶ 75).

22 Plaintiffs contend that the defendants manipulated facts to

23 justify Torres' death, fabricated investigation and autopsy

24 reports, and destroyed evidence demonstrating that Torres was an

25 innocent victim.  (Am. Compl. ¶¶ 76, 77, 81).  They also allege

26 that defendants conspired to enforce the integrated yard policy

27 knowing that it would result in violence, and an unwritten lethal

28 force policy which encouraged officers to shoot inmates for

22

1  unlawful reasons.   (Am. Compl. ¶¶ 82-84).   These allegations are
2  not supported by the evidence.

3          To state a claim under 42 U.S.C. § 1985 for conspiracy
4  to interfere with civil rights, plaintiffs must include an
5  allegation of racial or class-based animus.  Usher v. City of Los
6  Angeles, 828 F.2d 556, 561 (9th Cir. 1987) ("To establish racial
7  or class-based animus, a plaintiff must show 'invidiously
8  discriminatory motivation ... behind the conspirators'
9  action.'") (citing Griffin v. Breckenridge, 403 U.S. 88, 102
10  (1971)).   Furthermore, allegations under § 1985 must be supported
11  by specific facts.   Karim-Panahi v. Los Angeles Police Dept., 839
12  F.2d 621, 626 (9th Cir. 1988) ("A claim under this section must
13  allege facts to support the allegation that defendants conspired
14  together.   A mere allegation of conspiracy without factual
15  specificity is insufficient.").

16          Plaintiffs contend that the "Southern Hispanics," of
17  which Torres was a member, is a protected class for the purpose
18  of § 1985.   However, plaintiffs have produced no evidence
19  suggesting the existence of racial or class-based animus on the
20  part of Yearwood and other defendants underlying a conspiracy to
21  deprive the decedent of his civil rights.   Furthermore,
22  plaintiffs present no facts suggesting that Yearwood acted
23  jointly with other defendants to deprive Torres of his
24  constitutional rights.   Plaintiffs' allegations are insufficient,
25  as a matter of law, to establish a § 1985 violation.[5]

26

27          [5]    To the extent plaintiffs' request to add complaint
28  allegations in support of the § 1985 claim can be construed as a
    motion for leave to amend their complaint, this motion is DENIED.

1          G.   Claims Against Defendants in their Official Capacity

2               Plaintiffs have sued Yearwood for damages in her

3    individual and official capacity.   The Eleventh Amendment bars a

4    suit for damages against a state official who is sued in his or

5    her official capacity in federal court.   Kentucky v. Graham, 473

6    U.S. 159, 169 (1985); Dittman v. California, 191 F.3d 1020, 1026

7    (9th Cir. 1999).   Plaintiffs' claims against Yearwood in her

8    official capacity are dismissed.

9          H.   State Law Claims

10              Under 28 U.S.C. § 1367(c)(3), the court has discretion

11   to dismiss state law claims when it has dismissed all of

12   plaintiff's federal claims.   "In the usual case in which federal

13   law claims are eliminated before trial, the balance of factors .

14   . . will point toward declining to exercise jurisdiction over the

15   remaining state law claims."   Carnegie-Mellon Univ. v. Cohill,

16   484 U.S. 343, 350 n. 7 (1988); Schneider v. TRW, Inc., 938 F.2d

17   986, 993 (9th Cir. 1991).   Some circuits have held that a court

18   may retain jurisdiction over state law claims if extraordinary or

19   unusual circumstances justify their retention.   See, e.g., Musson

20   Theatrical, Inc. v. Federal Express Corp., 89 F.3d 1244, 1255

21   (6th Cir. 1996); Wentzka v. Gellman, 991 F.2d 423, 425 (7th Cir.

22   1993).   However, here there has been no showing of extraordinary

23   or unusual circumstances.   Accordingly, the court declines to

24

25   Allowing plaintiffs to amend the complaint at this stage in the
     litigation, after summary judgment motions have been filed, would
26   be inappropriate under either the standard of Fed. R. Civ. P.
     16(b) or the more liberal standard of Fed. R. Civ. P. 15.   More
27   importantly, the evidence presented in opposition to defendant's
     motion is insufficient, regardless of the allegations of the
28   complaint, to overcome defendant's motion.

1 | exercise supplemental jurisdiction under 28 U.S.C. § 1367(c) as
2 | to the remaining state law claims.

3 | I.   Evidentiary Objections

4 | Yearwood has offered numerous evidentiary objections to
5 | declarations and exhibits submitted by plaintiffs in support of
6 | their opposition.  Although these objections have merit, the
7 | court does not need to consider the objections because it
8 | concludes that plaintiffs' evidence does not raise a triable
9 | issue of fact sufficient to defeat Yearwood's motion for summary
10 | judgment.

11 | Plaintiffs object to Yearwood's brief in reply to their
12 | opposition on the basis that the reply sets forth new arguments.
13 | Plaintiffs do not identify what new arguments are set forth in
14 | the reply brief, and the court does not ascertain new arguments
15 | that could be construed as a "separate motion for summary
16 | judgment."  The court concludes that plaintiffs have not shown
17 | that they have been prejudiced by Yearwood's reply.

18 | Plaintiffs further object to Exhibits A through P
19 | attached to the second declaration of Ronald Scholar and
20 | submitted in support of Yearwood's reply.  Exhibit A is a copy of
21 | correspondence from plaintiffs' counsel to Magistrate Judge
22 | Hollows regarding the withdrawal of plaintiffs' counsel William
23 | Steven Rigg.  Exhibits B through G are evidentiary objections
24 | filed previously in support of the motions for summary judgment
25 | of other defendants.

26 | Exhibits H through K and Exhibit P are excerpts from
27 | the depositions of various defendants.  Plaintiffs' counsel
28 | cross-examined these defendants during their depositions and has

1 | attached portions of the depositions as exhibits to plaintiffs'
2 | opposition papers.

3 | Exhibit L is an excerpt from Yearwood's first set of
4 | interrogatories to plaintiffs and Exhibit M is an excerpt from
5 | plaintiffs' responses to these interrogatories. Exhibit N is an
6 | excerpt from defendant Yearwood's responses to plaintiffs' third
7 | set of interrogatories. Exhibit O is a copy of Magistrate Judge
8 | Hollows' December 19, 2001 order regarding discovery matters.

9 | The court concludes that plaintiffs have not shown that
10 | they have been prejudiced by the inclusion of these exhibits in
11 | Yearwood's reply. Thus, plaintiffs objections to Exhibits A
12 | through P are overruled.

13 | Finally, plaintiffs object to Yearwood's resume,
14 | attached as Exhibit A to her declaration in support of her
15 | motion, on various evidentiary grounds and on the ground that it
16 | was not produced in discovery. The court recognizes this
17 | objection and does not consider Exhibit A. However, this
18 | evidentiary ruling does not affect the foregoing analysis.[6]
19 | ///
20 | ///
21 | ///
22 |

23 | [6] Plaintiffs complain generally about "spoilation of
   | evidence" and discovery abuses by Yearwood and other defendants.
24 | Plaintiffs' motion to compel evidence including bullet fragments
   | and casings from the February 4, 1998 shooting was considered and
25 | denied by this court on October 3, 2001. Furthermore, plaintiffs
   | have had ample opportunity to file, and have filed, numerous
26 | discovery-related motions before this court and the magistrate
   | judge. Finally, this court has bent over backwards to address
27 | plaintiffs' concerns and ensure fairness in the discovery
   | process, for example by taking discovery away from the magistrate
28 | judge and personally presiding over the parties' depositions.

26

1    IT IS THEREFORE ORDERED that defendant Yearwood's
2  motion for summary judgment with respect to the federal causes of
3  action be, and the same hereby is, GRANTED.  The remaining state
4  claims are DISMISSED pursuant to 28 U.S.C. § 1367(c).
5  DATED: January 9, 2002

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE

27

United States District Court
for the
Eastern District of California
January 9, 2002

* * CERTIFICATE OF SERVICE * *

2:98-cv-02211

Estate Torres

    v.

Terhune

_____

I, the undersigned, hereby certify that I am an employee in the Office of
the Clerk, U.S. District Court, Eastern District of California.

That on  January 9, 2002, I SERVED a true and correct copy(ies) of
the attached, by placing said copy(ies) in a postage paid envelope
addressed to the person(s) hereinafter listed, by depositing said
envelope in the U.S. Mail, by placing said copy(ies) into an inter-office
delivery receptacle located in the Clerk's office, or, pursuant to prior
authorization by counsel, via facsimile.

       Roger E Naghash                SH/WBS
       Law Offices of Roger E Naghash
       One Newport Place
       1301 Dove Street
       Suite 1000
       Newport Beach, CA  92660-2478

       Michael J Williams
       Attorney General's Office of the State of California
       PO Box 944255
       1300 I Street
       Suite 125
       Sacramento, CA  94244-2550

       Gregory Scott Walston
       Attorney General's Office of the State of California
       455 Golden Gate Avenue
       Suite 11000
       San Francisco, CA  94102-3664

       Jesse Manuel Rivera
       Moreno and Rivera
       1451 River Park Drive
       Suite 205
       Sacramento, CA  95815

Van Longyear
Longyear O'Dea and Lavra
3620 American River Drive
Suite 230
Sacramento, CA  95864-5923

Bruce Alan Kilday
Angelo Kilday and Kilduff
601 University Avenue
Suite 150
Sacramento, CA  95825

John Andrews Mason
Adams and Mason
PO Box 19937
730 Alhambra Boulevard
Suite 202
Sacramento, CA  95816

Jack L. Wagner, Clerk

BY: _____
        Deputy Clerk